IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SFA SYSTEMS, LLC | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CASE NO. 6:07 CV 067 |
| | § | PATENT CASE |
| INFOR GLOBAL SOLUTIONS | § | |
| (MICHIGAN), INC, et al. | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

This memorandum opinion construes U.S. Patent No. 6,067,525 (the "'525 Patent").

## BACKGROUND

The '525 Patent describes a sales automation system. The system integrates various computer implemented subsystems used during the sales process. This integration allows the different subsystems to share data so that a change in one subsystem can be accounted for by all subsystems so that they may adapt accordingly. The various subsystems incorporate a wide variety of tasks that may be applicable to a particular sales environment including order management, training, customer retention, and sales. The subsystems may also include a number of "support" subsystems which function to aid the primary systems in their tasks. The patent teaches that these subsystems can be implemented in a variety of combinations depending on the sales environment provided that they are fully integrated with each other.

In order to fully integrate the many subsystems and allow the system as a whole to adapt to changing circumstances, the system employs an event manager. The event manager is responsible

for performing various functions allowing the subsystems to communicate and adapt as a group rather than individually. Overall the system seeks to maximize efficiency in the areas of promotion and sales.

SFA Systems, LLC ("SFA") alleges that Defendants (collectively "Infor") directly and indirectly infringe on the '525 Patent.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys.*, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a

dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in

determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## ANALYSIS

*Changes in State Characteristic of an Event*

Claims 1, 20, and 40 of the '525 Patent contain the term "changes in state characteristic of an event." SFA contends that the term means "changes in information relating to the status of an event." SFA argues that its definition is in accord with technical dictionaries that define "state" as "status." SFA suggests that the word "status" is more commonly understood than "state" and will thus aid the jury in understanding the scope of the patent. Defendants contend that the term is indefinite, but alternatively argue that the term means "changes in a data field stored in the database of the event manager." Defendants urge that because the term is borderline ambiguous, the term should be limited to the four corners of the preferred embodiment disclosed in the specification in order to serve the notice function of the claim. In support of their indefiniteness argument, Defendants suggest that the patentee served as his own lexicographer in defining "state characteristics" but failed to provide any soluble definition. However, as explained below, the term

4

is not indefinite and means "a change in a unique configuration of information within the system that is indicative of the occurrence of an event within the system."

Both parties provided definitions for the term "state characteristic*s*," and assumed that the patentee had coined the noun "state characteristic*s*" to describe some aspect of an event. However, the term "state characteristic*s*" never appears in any of the claim language. In fact, the proper reading of the phrase separates "state" from "characteristic" and applies the term "characteristic" as an adjective. Therefore, the correct reading is to the effect that changes in state *are* characteristic of an event occurring within the system.

The confusion regarding this term is understandably based on the Patent's prosecution history. In response to a rejection of all the claims in the original patent application as obvious in light of prior art (specifically the "Negrino reference"), the claims in the application were dramatically amended. *See* Plaintiff's Opening Construction Brief Ex. 2, Amendment of December 10, 1997. The phrase "changes in state characteristic of an event" was first added to the claims during this amendment. *Id.* at 2,7-8. In conjunction with these amendments, and in an attempt to distinguish the invention from the Negrino reference, the patentee explained that the invention "has the ability, based on the particular changes in state detected, to infer the particular context in which the event occurs." At this stage of the prosecution history, there is no reference to events having "state characteristics" or the patentee's intention to be his own lexicographer with respect to the term. Similarly, there seems to be no indication that the patent examiner mistook the phrase "state characteristic" to be a new term coined by the patentee. *See* Plaintiff's Opening Ex. 2, Office Action dated March 1, 1998 at 5. However, the examiner rejected claim 1 as indefinite for failing to particularly point out the subject matter of the invention. Specifically, the function of the "event

manager" was described in claim 1 as "inferring occurrence of an event based on detecting a change in state characteristic to said event," and then described in the specification as "recognizing the occurrence of events and then determining the context in which the event occurred." The examiner believed that because of the differences in these descriptions, the patentee was describing the "event manager" as having inconsistent functions. *Id*. at 5-6.

In response to the March 1998 office action, the patentee explained that the two descriptions described the same function. *See* Plaintiff's Opening Ex. 2, Amendment of July 14, 1998 at 2. The term "state characteristics" first appears in that explanation. In trying to provide a word-for-word translation of the two descriptions the patentee sloppily equated both the occurrence and context surrounding an event (words used in the specification description) with "state characteristics" (words used in the claim description). In reviewing this word-for-word translation, the examiner incorrectly concluded that the patentee was attempting to redefine "state characteristic" in order to conform the claim description with the description in the specification. *See* Plaintiff's Opening Ex. 2, Office Action of September 9, 1998 at ¶ 4 ("The Examiner recognizes that Applicants can be their own lexicographers and accepts their explanation regarding 'state characteristic of an event.'").

After reviewing the entire record including the descriptions of the function of the "event manager" in the specification and the claims, it is evident that the descriptions describe the same function to one skilled in the art without necessitating a unique definition of "state characteristic." Therefore, both sides' suggested definitions must be rejected. It is also evident that the patentee did not intend to redefine "state characteristic" when explaining the discrepancy to the patent examiner. Rather, the explanation in the July 1998 Amendment was a muddled attempt to explain that the "event manager" performs its function by recognizing changes in unique data configurations, and

6

thus, the claim language and specification description were in agreement. A "state" is well understood in the art to mean a certain unique configuration of information.[1] This definition of "state" is well illustrated in the specification. For example, data concerning customer interests provided to the "lead generation" component of the system will change the unique configuration of information, thus prompting the "event manager" to transfer the data to other components of the system for "action or follow-up." *See* '525 Patent at 11:23-26. There are numerous other examples. *See, e.g. id.* at 13:20-24, 15:4-16, 27:41-46. Given the examples provided in the specification, along with the generally understood definition of state, one skilled in the art would understand "changes in state characteristic of an event" to mean "a change in a unique configuration of information within the system that is indicative of the occurrence of an event within the system."

*Context*

Claims 1, 2, 3, 4, 15, 16, 18, 19, 20, 21, 24, 27, 28, 30, 31, 32, and 40 contain the term "context." Though this term was originally disputed, during the hearing both sides agreed that the definition of the term is "information already existing within the system that becomes relevant upon the occurrence of an event." This definition is in conformity with the claim language, specification, and prosecution history and is adopted accordingly.

*Event Manager*

Claims 1, 40, 41, and 42 contain the term "event manager." SFA suggests that the term means "hardware and/or software that takes or directs an action relative to an event." It argues that

---

[1] *See* "State," *The Computer Network Glossary* (2008), http://www.cnet.com/Resources/Info/Glossary/Terms/state.html ("The state of a system or a Web page is its condition: its attributes, configuration, or content."); "State," *Free Online Dictionary of Computing* (2008), http://foldoc.org/index.cgi?query=state ("How something is; its configuration, attributes, condition, or information content.").

the term must encapsulate a variety of functions including determining when an event has occurred, determining an event's context, and initiating automatic operations. Furthermore, SFA urges that its definition is in agreement with the standard dictionary definition of "manage" meaning "to direct or control."[2] Conversely, Infor defines the term as "a hardware and/or software module functionally separate and apart from the subsystems that intelligently controls the flow of information between the subsystems." Infor contends that since every description of the "event manager" in the specification has it separated from the variety of subsystems, the definition should include this separation. Further, Infor argues that "intelligent control" was heavily relied upon by the patentee during prosecution to distinguish the invention from the Negrino Reference.

Both sides' definitions redundantly provide for general descriptions of the function of the "event manager" when a more specific description of its function is provided for in the claim language itself. First, Infor's inclusion of the relationship between the "event manager" and the subsystems is unnecessary. Independent claims 1 and 40 describe "an event manager, coupled to the subsystems." The term "coupled to" necessarily implies that the event manager is separate from the various subsystems. Adding an additional "separation" limitation would only be redundant and confusing to the jury. Likewise, both sides attempt to incorporate the general function of the "event manager" in their definitions. Ultimately, these descriptions are vague and redundant of the claim language. Claim 1 provides that the "event manager detect[s] . . . infer[s] . . . and automatically initiat[es] an operation in one or more particular subsystems." Claim 40 has almost identical language. Both Infor's and SFA's definitions are too broad in light of the very specific functions

---

[2] American Heritage Dictionary of the English Language: Fourth Edition (Manage: To direct or control the use of; handle).

provided for in the claim language. Further, Infor's term, "intelligently controls," is vague and would require even further definition. The claim language already provides for the "event manager's" relationship with the subsystems as well as its various functions. No additional limitations are necessary beyond the agreed limitation that the event manager must be "hardware and/or software." Accordingly, the Court construes the term as "hardware and/or software."

*Expert System*

Claims 41 and 42 of the '525 Patent contain the term "expert system." SFA cites to a host of dictionary definitions and proposes that the term should be defined as "a system that learns successful actions and automatically implements them in the future" in conformity with those definitions. Infor counters that SFA's definition describes the "expert system's" purpose rather than its structural function. Infor claims that the prosecution history along with the specification require that the term be defined as "a system that includes an inference engine to provide rules-based decision making using a knowledge base and a set of rules." As discussed below, the proper construction of "expert system" in accordance with the specification is "a software program operating on a set of rules which can be automatically updated based upon successful sales approaches."

Infor is correct in noting that SFA's definition fails to disclose anything about an "expert system's" structure. Rather, SFA's definition describes very generally the result that an "expert system" seeks to obtain. Patent system claims protect the system's structure and not its effect. *See Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (explaining that apparatus claims "cover what a device *is*, not what a device *does*"). As a result, SFA's definition is too broad and must be rejected.

9

Conversely, Infor seeks to narrow the scope of "expert system" by requiring that the system necessarily contain an inference engine. The specification clearly suggests an inference engine "in accordance with one embodiment," but there is no support in the specification for the proposition that an expert system must contain an inference engine. *See* '525 Patent at 34:23-44. Regardless, Infor claims that the prosecution history suggests that the patentee disclaimed all embodiments of an expert system that do not contain an inference engine.

An inference engine is a particular type of software program. As it is described in the '525 Patent, an inference engine relies upon a number rules that take the general form of the statement IF X THEN Y. Based upon a series of these rules, the inference engine is able to determine whether a particular action should be taken in light of the existence of a set of conditions. *See id.* The term "expert system" only appears in dependent claims 41 and 42. Those claims refer to independent claim 40 which was amended during prosecution to include the step of "infer[ring] occurrence of the event and a context" after the examiner's rejection of all the initial claims in light of the Negrino Reference. *See* Plaintiff's Opening Ex. 2, Amendment of December 10, 1997. Infor contends that because the only mention of the word "infer" in the specification occurs during explanation of the inference engine, the inference engine is the only disclosed structure capable of "inferring." Infor concedes that this argument has the result of collapsing claims 40-42 and violates the presumption of claim differentiation. *See Phillips*, 415 F.3d at 1314-15.

While the presumption of claim differentiation may be rebutted if a patent's specification makes clear that independent and dependant claims share the same scope, the specification in this case is careful to do just the opposite. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007). For example, the specification provides not only that an inference

engine is applicable in "one embodiment," but refers to the inference engine several times as an "example." '525 Patent at 33:63. The specification clearly indicates that the inference engine is a component of a particular embodiment of an expert system and not required. *Id.* at 34:23-26. Further, claim 42 teaches "[a] system as recited in claim 40, wherein the event manager comprises an expert system configured to automatically monitor events occurring in the sales process, identify which events lead to a desired outcome in a use of the sales system, and produce a knowledge database for use in subsequent operations as the prior sales experience using the sales system." None of these functions necessarily requires an inference engine as described in the specification. To include that additional limitation would be improper.

Finally, Infor's argument concerning the addition of the word "infer" in claim 40 would not only require an inference engine to necessarily be included in claims 41-42, but would mandate that an inference engine be included wherever the word "infer" appeared in the patent. This would require that *all* claims in the '525 Patent include an inference engine. As further explained below, there is no evidence in the specification or the prosecution history that such a limitation is warranted. Thus, Infor's definition is rejected.

The specification describes an expert system's structure. An expert system may be "programmed to monitor the sales process for desired (successful) sales events." '525 Patent at 33:34-36. Thus, the expert system is a computer program. Further, the expert system is identified as operating on a set of rules. *Id.* at 33:44-47, 34:44-46. Finally, the specification indicates that the rules are automatically updated in a way that targets the most successful sales approaches. *Id*. at 33:41-46. Thus, the specification identifies an expert system as "a software program operating on a set of rules which can be automatically updated based upon successful sales approaches."

*Inferring*

Claims 1, 20, 22, 23, 33, 34, 35, 36, 37, 38, 39, and 40 contain the term "inferring." SFA defines the term in accordance with a general dictionary definition as "deriving based upon one or more facts or circumstances." SFA makes no effort to analyze the definition with regard to the intrinsic evidence. Claim terms do not occur in a vacuum. *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008). While technical definitions may often be helpful in understanding a commonly understood meaning, extrinsic evidence is inherently "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted). As a result of SFA's failure to examine the intrinsic record, its definition is too broad and unhelpful in understanding the technology. SFA's construction must be rejected.

Conversely, Infor argues that "infer" and all its derivatives (discussed below) are indefinite because they are not specifically defined or discussed in the specification and are open to multiple inconsistent meanings based on the intrinsic and extrinsic evidence. Alternatively, Infor argues that "infer" should be strictly construed in light of the specification to mean "the computerized logical process by which a factual conclusion is derived from known facts by the application of logical rules using the inference engine of an expert system within the event manager." Again, Infor suggests that because the only mention of the word "infer" in the specification is in a description of an inference engine, an inference engine must be attributed to all instances of "inferring" within the claims.

Indefiniteness is a matter of claim construction, and the same principals that generally govern claim construction govern indefiniteness. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). "A claim satisfies the definiteness requirement of § 112 if one skilled in the art would

understand the bounds of the claim when read in light of the specification." *Id.* (internal quotation marks omitted). A claim is indefinite only where there is clear and convincing evidence that the claim is insolubly ambiguous, and no narrowing construction can be properly adopted. *Id.* However, the claim is sufficiently clear to avoid indefiniteness "if the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree . . . ." *Id.*

In light of these principals, Infor's argument is fatally flawed. A term does not have to be specifically explained in the specification to be understood by one skilled in the art. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1217 (Fed. Cir. 2003) (finding that though term "computer" never appeared in the specification, those skilled in the art would understand that "computer" was structure to perform the disclosed functions"); *Motorola, Inc. v. Analog Devices, Inc.*, No. 1:03-CV-131, 2004 WL 5633737 at *24 (E.D. Tex. June 7, 2004) (Clark, J.) ("In view of the essential agreement between the parties as to the plain meaning of the phrase, the fact that it is not used in the patent specification does not render the term indefinite."). Whenever the term "infer[ring]" appears in the claim, it refers to either an "occurrence of an event," "context," or both. This "inferring" only takes place upon a change in state that is characteristic of some event. Thus, the context surrounding "infer" suggests that "inference" is a form of event recognition and analysis. This process is disclosed early in the specification as "recogniz[ing] events occurring in the system and determin[ing], on the basis of the event and the context in which the event occurs, what if any other actions or operations should be carried out by the system." '525 Patent at 8:36-39. This is also consistent with the function as it evolved in the prosecution history. Plaintiff's Opening Ex. B, Amendment of Dec. 15, 1997 at 16 (arguing that the prior art fails to teach "event

recognition"). Further, the parties agree that the plain and ordinary meaning of the of term is "deriving." The only remaining inquiry is determining the process by which "inferring" is achieved.

Infor uses the ordinary technical definition of "infer" as the backbone of its suggested construction. According to that definition "inference" is a "logical process by which a factual conclusion is derived from known facts by the application of logical rules." "Inference," *Free On-Line Dictionary of Computing (2008)*, http://foldoc.org/index.cgi?query=inference; "Inference, Computer User (2008), http://www.computeruser.com (follow "Dictionary" link, then search "inference"). This definition harmonizes with the specification's description of the "inferring" function as a type of event recognition. Furthermore, the specification provides a detailed description of the functions of the event manager (the structure responsible for "inferring"), both generally and as it relates to particular subsystems. *See* '525 Patent at 8:34-57. The event manager is repeatedly described as operating on a set of rules. '525 Patent at 32:13-14, 20-21, 37-40. Thus, one skilled in the art would understand the "inferring" process as a "logical process by which a factual conclusion is derived from known facts by the application of logical rules." Since the meaning of "infer" can be readily deduced by one of ordinary skill in the art, a limiting construction, such as the one proffered by Infor requiring that "inferring" be limited to an embodiment containing an "inference engine," is unnecessary. Infor's indefiniteness objection is overruled.

*Inferring occurrence of an event; Inferring . . . a context in which the event occurred*

Claims 1, 20, and 40 contain both the terms "inferring occurrence of an event" and "inferring . . . a context in which the event occurred." For both of these terms, SFA argues that no construction is necessary because the component phrases of the terms have already been construed. Infor asserts that the terms are indefinite for the same reason as the term "inferring" and alternatively provides

limiting constructions restricting the term to the embodiments disclosed in the specification. For the reasons previously discussed, the Court rejects Infor's indefiniteness arguments. The component terms of these phrases have already been construed, and there is no reason to provide an alternative construction to the phrases as a whole. As a consequence, "inferring occurrence of an event" means a "logical process by which the fact that an event has occurred is derived by application of logical rules." Moreover, "inferring . . . a context in which the event occurred" means a "logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules."

*Subsystem*

Claims 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 17, 18, 19, 20, 22, 23, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40 contain the term "subsystem." SFA suggests that the term is self-defining and no limitations are necessary beyond the common meaning: "a system that is part of a larger system." Infor concedes that SFA's definition is commonly understood and does not dispute its accuracy. Regardless, it contends that reading the term in context reveals that a "subsystem" must be a) separate from the event manager, b) either hardware or software, and c) must correspond to a phase in the sales process. Thus, Infor defines "subsystem" as "a hardware or software module independent of the event manager and corresponding to a phase of the sales process."

Initially, Infor's use of the word "module" does little to clarify or assist the jury in understanding the scope of "subsystem" and creates more ambiguity than it corrects. Further, each of the limitations that Infor seeks to apply to "subsystem" are contained elsewhere in the claims. As explained, the limitation in independent claims 1 and 40 that the event manager is "coupled to" the subsystems sufficiently discloses the relationship between the event manager and subsystems.

Additionally, all independent claims contain the limitation that the system, for which the subsystems are a part, must be "computer implemented" and thus comprised of hardware and software. Finally, all the independent claims require that the system, and thus the subsystems, be used to "facilitate the sales process." Therefore, "subsystems" used to facilitate another process would conspicuously fall outside the scope of the patent. In light of the claims and specification, no additional limitations must be imposed upon a "subsystem." Therefore, the term is construed in accordance with its ordinary interpretation: "a system that is part of a larger system."

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in Appendix A.

**So ORDERED and SIGNED this 23rd day of February, 2009.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

# APPENDIX A

| Claims | Term | Definition |
|---|---|---|
| 1, 20, 40 | "changes in state characteristic of an event" | a change in a unique configuration of information within the system that is indicative of the occurrence of an event within the system |
| 1, 2, 3, 4, 15, 16, 18, 19, 20, 21, 24, 27, 28, 30, 31, 32, 40 | "context" | information already existing within the system that becomes relevant upon the occurrence of an event |
| 1, 40, 41, 42 | "event manager" | hardware and/or software |
| 41, 42 | "expert system" | a software program operating on a set of rules which can be automatically updated based upon successful sales approaches |
| 1, 20, 22, 23, 33, 34, 35, 36, 37, 38, 39, 40 | "inferring" | logical process by which a factual conclusion is derived from known facts by the application of logical rules |
| 1, 20, 40 | "inferring . . . a context in which the event occurred" | logical process by which the fact that information already existing within the system that becomes relevant upon the occurrence of an event is derived by application of logical rules |
| 1, 20, 40 | "inferring occurrence of an event" | logical process by which the fact that an event has occurred is derived by application of logical rules |
| 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 17, 18, 19, 20, 22, 23, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40 | "subsystem" | a system that is part of a larger system |