**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| SFA SYSTEMS, LLC f/k/a | § | |
| TRITON IP, LLC | § | |
| | § | CIVIL ACTION NO. 6:07-cv-067[LED] |
| v. | § | |
| | § | JURY |
| INFOR GLOBAL SOLUTIONS | § | |
| (MICHIGAN), INC.,   et al. | § | |


**INFOR'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................. 1

II.     Undisputed Material Facts ........................................................................................... 1

III.    Summary of Applicable Law ....................................................................................... 2

IV.     U.S. Pat. No. 5,347,632 (Filepp) Anticipates Claims 1-3, 5, 7, 20, 24, 34, and 40 ............ 3

        A.      Filepp Is a "Computer Implemented Sales System Used to Facilitate a Sales
                Process" .......................................................................................................... 3

        B.      Filepp Discloses "A Plurality of Subsystems Configured to Facilitate One or
                More Actions Performed During at Least One Phase of the Sales Process" .......... 3

        C.      Filepp Discloses "An Event Manager, Coupled to the Subsystems, the Event
                Manager Detecting One or More Changes in State Characteristic of an Event
                Occurring Within the System." ........................................................................ 4

        D.      Filepp Discloses "Inferring Occurrence of the Event and a Context in Which the
                Event Occurred Based at Least in Part on the Detected Changes in State" ............. 4

        E.      Filepp Discloses "Automatically Initiating an Operation in One or More Particular
                Subsystems of the Computer to Facilitate a New Action Based on the Inferred
                Context" ......................................................................................................... 6

        F.      Filepp Anticipates or Makes Obvious the Additional Limitations of Dependent
                Claims 2, 3, 5, 7, 24, and 34 ............................................................................ 7

V.      U.S. Pat. No. 5,117,354 (Long et al.) Anticipates Claims 1-3, 5, 7, 8, 10, 12, 20, 24, 34,
        35, 37, and 40 ............................................................................................................. 9

        A.      Long Is a "Computer Implemented Sales System Used to Facilitate a Sales
                Process" .......................................................................................................... 9

        B.      Long Discloses "A Plurality of Subsystems Configured to Facilitate One or More
                Actions Performed During at Least One Phase of the Sales Process" .................... 9

        C.      Long Discloses "An Event Manager, Coupled to the Subsystems, the Event
                Manager Detecting One or More Changes in State Characteristic of an Event
                Occurring Within the System." ...................................................................... 10

        D.      Long Discloses "Inferring Occurrence of the Event and a Context in Which the
                Event Occurred Based at Least in Part on the Detected Changes in State" ........... 10

        E.      Long Discloses "Automatically Initiating an Operation in One or More Particular
                Subsystems of the Computer to Facilitate a New Action Based on the Inferred
                Context" ....................................................................................................... 11

F.      Long Anticipates or Makes Obvious the Additional Limitations of Dependent Claims 2, 3, 5, 7, 8, 10, 12, 24, 34, 35, and 37 ......................................................11

VI.    U.S. Pat. No. 4,567,359 (Lockwood) Anticipates Claims 1-3, 5-7, 20, 24, 34 and 40......15

A.      Lockwood Is a "Computer Implemented Sales System Used to Facilitate a Sales Process ..............................................................................................................15

B.      Lockwood Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process".........15

C.      Lockwood Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."..........................................................................15

D.      Lockwood Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State".....15

E.      Lockwood Discloses "Automatically Initiating an Operation in One or More Particular Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context" ....................................................................................................16

F.      Lockwood Anticipates or Makes Obvious the Additional Limitations of Dependent Claims 2, 3, 5-7, 24, and 34................................................................16

VII.   U.S. Pat. No. 5,201,010 (Deaton) Invalidates Claims 1-3, 5, 7, 20, 24, 34 and 40 ..........19

A.      Deaton Is a "Computer Implemented Sales System Used to Facilitate a Sales Process ..............................................................................................................19

B.      Deaton Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process".........19

C.      Deaton Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."..........................................................................20

D.      Deaton Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"...........20

E.      Deaton Discloses "Automatically Initiating an Operation in One or More Particular Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context" ....................................................................................................22

F.      Deaton Anticipates or Makes Obvious the Additional Limitations of Dependent Claims 2, 3, 5, 7, 24, and 34 ..............................................................................22

VIII.  U.S. Pat. No. 5,774,868 (Cragun) Anticipates Claims 1-3, 5, 7, 20, 24, 34, and 40 .........24

A. Cragun Is a "Computer Implemented Sales System Used to Facilitate a Sales Process ...................................................................................................................24

B. Cragun Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process" .........24

C. Cragun Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System." .............................................................................25

D. Cragun Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State" ...........25

E. Cragun Discloses "Automatically Initiating an Operation in One or More Particular Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context" ...............................................................................................26

F. Cragun Anticipates or Makes Obvious the Additional Limitations of Dependent Claims 2, 3, 5, 7, 24, and 34 ................................................................................26

IX. U.S. Pat. No. 4,947,028 (Gorog) Anticipates Claims 1-3, 5, 7, 20, 24, 34, and 40 ...........28

A. Gorog Is a "Computer Implemented Sales System Used to Facilitate a Sales Process ...................................................................................................................29

B. Gorog Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process" .........29

C. Gorog Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System." .............................................................................29

D. Gorog Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State" ...........30

E. Gorog Discloses "Automatically Initiating an Operation in One or More Particular Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context" ...............................................................................................31

F. Gorog Anticipates or Makes Obvious the Additional Limitations of Dependent Claims 2, 3, 5, 7, 24, and 34 ................................................................................31

X. The Asserted Claims are Obvious.......................................................................................33

XI. Conclusion ...........................................................................................................................34

119645.00604/11924458v.3

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................................... 2

*First Nat'l Bank v. Cities Serv. Co.,*
    391 U.S. 253 (1968)................................................................................................... 31

*Hines v. Consol. Rail Corp.,*
    926 F.2d 262 (3d Cir. 1991) ...................................................................................... 2

*KSR Int'l Co. v. Teleflex, Inc.,*
    550 U.S. 398 (2007)..................................................................................................... 3

*Verdegaal Bros., Inc. v. Union Oil Co.,*
    814 F.2d 628 (Fed. Cir. 1987) ................................................................................... 2

**STATUTES**

35 U.S.C. § 102(e) .......................................................................................................... 24

35 U.S.C. § 103........................................................................................................ 3, 33, 34

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56.......................................................................................................... 2, 31

119645.00604/11924458v.3

I.      **Introduction**

SFA Systems, LLC ("SFA") filed this lawsuit against Infor Global Solutions (Michigan), Inc.

and Infor Global Solutions (Chicago), Inc. (collectively "Infor") alleging that certain of Infor's

products infringe claims 1-3, 5-8, 10, 12, 20, 24, 34, 35, 37, and 40-42 of SFA's patent, U.S. Pat. No.

6,067,525 ("the '525 patent").  With fact and expert discovery closed, the undisputed evidence of

record demonstrates that the asserted claims are anticipated and/or obvious in view of the prior art.

II.     **Undisputed Material Facts**

1.      SFA filed this patent infringement suit alleging that certain of Infor's products infringe the

        '525 patent.  A copy of the '525 patent is attached as Exhibit 1.

2.      SFA is asserting infringement of Claims 1-3, 5-8, 10, 12, 20, 24, 34, 35, 37, and 40-42 of the

        '525 patent.

3.      The independent claims of the '525 patent, Claims 1, 20, and 40, each require a system that,

        *inter alia*:  (1) has a plurality of subsystems configured to facilitate actions performed during

        at least one phase of the sales process; (2) detects changes in state characteristic of an event

        occurring within the system; (3) infers occurrence of the event and a context in which the

        event occurred based at least in part on the detected changes in state; and (4) automatically

        initiates an operation in one or more particular subsystems to facilitate a new action based on

        the inferred context.  '525 patent at Claims 1, 20, and 40.

4.      In addition, independent Claims 1 and 40 require that the system has an event manager that

        is:  (1) coupled to the subsystems; and (2) performs the "detection," "inferring," and

        "automatic initiation" steps.

5.      On February 23, 2009, the Court issued a Memorandum and Opinion construing certain

        terms of the '525 patent.  D.E. # 211.

6.      In support of its invalidity allegations, Infor served its Fourth Amended Invalidity

        Contentions, Exhibit 2, on May 4, 2009 and the expert report of Dr. Daniel Cooke ("Cooke

        Report"), Exhibit 3, on May 8, 2009.

7.      In rebuttal, SFA served the expert report of Craig Thompson ("Thompson Report"), Exhibit 4, on June 4, 2009.

8.      Mr. Thompson was deposed ("Thompson Tr."), Exhibit 5, on July 21, 2009.

9.      Dr. Cooke's report clearly demonstrates that the asserted prior art, namely U.S. Pat. No. 5,347,632 (Exhibit 6), U.S. Pat. No. 5,117,354 (Exhibit 7), U.S. Pat. No. 4,567,359 (Exhibit 8), U.S. Pat. No. 5,201,010 (Exhibit 9), U.S. Pat. No. 5,774,868 (Exhibit 10), and U.S. Pat. No. 4,947,028 (Exhibit 11) disclose each and every element of the asserted claims as described in detail below.

10.     Therefore, the asserted prior art references anticipate the asserted claims.  *See infra*.

11.     Moreover, to the extent any element of any of the asserted claims is missing from any of the asserted references, the missing elements would have been obvious to one of skill in the art in view of the references alone or in combination.  *See infra*.  In addition to the prior art references mentioned above, the Spezialetti reference (Exhibit 12) teaches the inferring element of the asserted claims, and in combination with other references, Spezialetti renders the asserted claims obvious.

12.     SFA has not offered any evidence of validity other than Mr. Thompson's opinions.

13.     Mr. Thompson has failed to raise a genuine of material fact regarding the validity of any of the claims in view of the asserted prior art.

## III.    <u>Summary of Applicable Law</u>

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991).  "A [patent] claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987).  In addition, a patent claim is obvious if, although the subject matter is not identically disclosed in the asserted prior art, the differences would

have been obvious to one of skill in the art.  35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 420 (2007).  In this case, it is clear that no genuine issues of material fact exist and that the asserted claims are anticipated and/or obvious in view of the asserted prior art.

IV.     **U.S. Pat. No. 5,347,632 (Filepp) Anticipates Claims 1-3, 5, 7, 20, 24, 34, and 40**

Filepp discloses a computer system that enables a user to perform any number of types of transactions such as sales transactions like banking, shopping, and displaying individualized advertisements.  Cooke Report at 30; Cooke Appx. C at 1.  Even Mr. Thompson concedes that the elements are there.  While Mr. Thompson states that, for example, Filepp has "no relationship to an integrated sales force automation application suite."  Thompson Report at 54.  A review of claims reveals no such limitation.

A.     Filepp Is a "Computer Implemented Sales System Used to Facilitate a Sales Process"

There is no doubt that Filepp is a computer implemented system, and it certainly includes the functionality of a sales system and can be used to facilitate a sales process. Cooke Report at 30; Cooke Appx. C at 1.  Mr. Thompson says that "It is doubtful" that Filepp "is a 'sales system used to facilitate a sales process,'" but the basis for this is the '525 patent's title and specification, not the claims.  Thompson Report at 56.  Mr. Thompson also says this is "doubtful" because there is no salesperson.[1]  Thompson Report at 57.  The claims, however, require no salespersons.  Mr. Thompson does concede that the Filepp system can be used for any purpose including for sales. Thompson Tr. at 111:20-113:24 ("you'd have to believe that the prodigy system could be used for system – for uses like that [i.e. sales]").

B.     Filepp Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process"

Filepp discloses this subsystem element as the "partitioned applications" as well as the object processing means that select and retrieve objects, and interpret and execute the partitioned

---

[1] Interestingly, SFA asserts that Infor's accused systems infringe the claims of the '525 patent even when the systems are implemented in such a way as to interact only with end users through a website.  Apparently Mr. Thompson believes that this would not constitute infringement – in direct contradiction of SFA's position.

119645.00604/11924458v.3

applications.  Cooke Report at 30; Cooke Appx. C at 1-3; Thompson Report at 59 ("Some partitioned applications built for Prodigy could be used by end-users to purchase retail items and make airline reservations").  Mr. Thompson concedes this element in his Report.  Thompson Report at 59.

Similarly, at his deposition, Mr. Thompson agreed that this element was met.  Thompson Tr. at 113:7-24.  When asked whether Filepp discloses subsystems that facilitate the sales process, Mr. Thompson stated.  "I don't think it's directed in that way.  That's not the emphasis.  It's certainly possible that someone could use it to implement a step or a phase of a sales process."  Thompson Tr. at 113:21-24 (emphasis added).  In light of the obvious, Mr. Thompson does not dispute that Filepp discloses sales as one possible and contemplated use of the system.

C.     Filepp Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."

The event manager in Filepp is the reception system operating software, and this event manager detects changes in state characteristic of events occurring within the system.  Cooke Report at 30; Cooke Appx. C at 4-6.  Mr. Thompson agrees.  Thompson Report at 62 ("Filepp '632 Patent performs this Claim element").  "Filepp is clear that there is an event manger."  Thompson Tr. at 114:8-9.  By way of but one example, the "event manager" in Filepp detects changes in state, such as user inputs, or physical events, for example when a user presses the RETURN key, when there is data entry within a certain field, or when there are mouse clicks in particular fields.  Cooke Report at 30; Cooke Appx. C at 5.

D.     Filepp Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"

Filepp discloses inferring occurrence of events and inferring context, based on the detected changes in state.  For example, any one the inputs described above as a detection of change in state, when taken together with data associated with these inputs, cause the event manager, or the RS Software to infer the occurrence of events within the system.  Cooke Report at 30; Cooke Appx. C at 7-10.  The events inferred can be that a certain transaction is desired or being carried out by the user,

4

or the type of transaction desired, or the type of customer, or group of customers.  Cooke Report at 30; Cooke Appx. C at 7-10.  The inferred event (e.g. that a purchase transaction is taking place) along with the inferred context (e.g. the type of customer) can be used by the system to target a subset of the advertisement available within the system to those that are most appropriate based on, for example, the desired transaction and the other context.  Cooke Report at 30; Cooke Appx. C at 10.  Filepp implements this by taking system and input data, and using it to construct queues of advertisements that target either individual users, or a set of users, who fall into certain groups according to various parameters.  Because the inferred event, the inferred context, or both are derived from the detected change in state, they are "based on" the detected change in state.[2]

Once again, Mr. Thompson attempts to avoid the Court's construction.  In his Deposition, Mr. Thompson explains when he was reviewing Filepp and all the other prior art references cited by Infor, he was looking for "an inference mechanism."  Thompson Tr. at 116:22-117:8.  More specifically, he was looking for "an inference engine with a rule base," "entries into a semantic web knowledge base," something "somehow call some learning mechanism," or something beyond just calling a fixed set of procedural step."  *Id.* at 117:13-18.  None of these <u>elements</u> are required by the Court's construction of inferring.  When pressed to explain his position, Mr. Thompson acknowledges that Filepp discloses at least the mapping of physical events to logical events.  *Id.*  He fails to explain, however, why such mapping, when it relates to the mapping of physical events, such as a mouse click, to logical events, such as a purchase transaction, is not using logical rules (i.e. the mapping rules) to derive a factual conclusion (i.e. the purchase transaction) from known facts (i.e. the physical event).

Similarly, Mr. Thompson concedes that Filepp discloses the use of demographic profiles (which is the same feature SFA alleges is context and infringing in Infor's software); however, without any explanation, he gives no explanation why this is not context in the prior art.  Thompson

---

[2] Moreover, when alleging infringement, SFA's expert, Mr. Cole, asserted that an inference is "based on" a change in state if it occurs later in time than the detected change in state.  *See* Cole Tr., Exhibit 13, at 128:5-11.

119645.00604/11924458v.3

Report at 66.  Clearly, the use by the system of certain demographic information (the universe of which is the "information already existing within the system, and the subset of which is what becomes relevant upon the occurrence of the event) is the inference of context.  The system applies rules to determine what subset of demographic information from the universe of demographic information is relevant to particular transaction.  Cooke Report at 30; Cooke Appx. C at 10.  Finally, Mr Thompson complains that "there is no indication the advertisements were related to automation of a sales force."  Thompson Report at 66.  This statement is wholly irrelevant, however, as no such requirement can be found in the claims.

      E.      <u>Filepp Discloses "Automatically Initiating an Operation in One or More Particular<br>Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context"</u>

In the system disclosed by Filepp, once the system infers the occurrence of the event and the context, the system automatically initiates an action in a subsystem which is the retrieval of specified system objects that are passed into the partitioned applications, where the retrieved objects are contextually relevant to the creation of advertisements in the partitioned applications.  Cooke Report at 30; Cooke Appx. C at 11-13.  The automatically initiated operation, i.e. the retrieval and display of contextually relevant ads, is based on context existing within the system that becomes relevant upon occurrence of the event.  Cooke Report at 30; Cooke Appx. C at 12-13.  The selection of context for use in the creation of the advertisements is inferred by logical process and rules based at least in part on the detected changes in state.  Cooke Report at 30; Cooke Appx. C at 12-13.  The retrieval of contextually relevant object facilitates the action, which is the creation of advertisements within the partitioned application.  Cooke Report at 30; Cooke Appx. C at 12-13.

Mr. Thompson concedes that Filepp "discloses a system that can initiate an operation in one or more particular subsystems of the computer to facilitate a new action."  Thompson Report at 68.  Mr. Thompson does, however, dispute two points:  (1) he says there is no evidence that the initiation is automatic; and (2) he says the automatic initiation is not based on inferred context.  *Id.*

First, it is clear from a review of Filepp that the initiation of operations such as the retrieval

of pertinent information and the display of targeted advertisements is automatic.  Cooke Report at 30;
Cooke Appx. C at 11-12.  Filepp retrieves and displays advertisements without any human
intervention  *Id.*  Mr. Thompson's unsupported, bald statement that "there is not enough detail to
know" that the process is automatic is, simply put, incredulous.  Second, as discussed above, there is
no material dispute that Filepp infers context.  Mr. Thompson's sole basis to say that the automatic
initiation is not based on inferred context is his flawed assertion that Filepp does not infer context.
This objection to Filepp is equally unpersuasive.

      F.      <u>Filepp Anticipates or Makes Obvious the Additional Limitations of Dependent Claims
2, 3, 5, 7, 24, and 34</u>

Claim 2 and 24 include the additional limitation:  "wherein the inferred context includes
information related to at least one phase of the sales process."  '525 patent Claim 2 and 24.  Filepp
discloses using information related to at least one phase of the sales process as inferred context by,
for example, using demographic data or personal interest codes as context to prepare the queue of
advertisements.  Filepp at col. 81, lines 15-22; *see also* Cooke Appx. C at 14-15.  Moreover, Mr.
Thompson admits that Filepp discloses using such information as context:  "it is clear that in the
Filepp '632 Patent, information relevant to an advertisement (e.g., pages browsed and user
demographics) is passed among subsystems of the Prodigy system…."  Thompson Report at 71, 87
(incorporating claim 2 into claim 24).

Claim 3 claims "a system as recited in Claim 1 wherein the inferred context includes
information related to whether a previous event has occurred in the sales process."  '525 patent Claim
3.  Filepp discloses using information related to whether a previous event has occurred in the sales
process as inferred context by, for example, using events that a user generated in response to
applications as context to prepare the queue of advertisements.  Filepp at col. 9, lines 35-47; *see also*
Cooke Appx. C at 16-17.  Moreover, Mr. Thompson admits that Filepp discloses using such
information as context:  "it is arguable that, in the Filepp '632 Patent, a previous event can result in a
later event…."  Thompson Report at 73.

7

Claim 5 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a lead generation subsystem configured to convert a name to a potential customer."  '525 patent Claim 5.[3]  Filepp discloses a "time with customer subsystem," for example, by disclosing the partitioned application subsystem that displays advertisements to a customer to convert leads to buying customers.  Filepp at col. 9, lines 30-34; Cooke Appx. C at 18; Thompson Report at 74 ("Filepp '632 Patent performs some of the function of the '525 Patent's 'time with customer' subsystem").

In addition, the partitioned application subsystem that displays advertisements to a customer is a lead generation subsystem configured to convert a name to a potential customer.  Filepp at col. 6, lines 45-68 and col. 9, lines 30-34; Cooke Appx. C at 18-19.  For example, if an advertisement directed a user to click for more information, that advertisement would be generating leads, rather than closing sales.  Mr. Thompson suggests that Filepp does not disclose this element because "the customer is already known."[4]  Thompson Report at 75.  This statement is nothing more than empty rhetoric.  At the time a person clicks on a displayed advertisement, they often are not a current customer of the company represented in the advertisement.  One purpose of advertising is to attract new customers by converting non-customers, i.e. a "name," into "potential customers" or leads.  Mr. Thompson chooses to label the person as a "customer," but the fact remains that one of the functionalities provided by the advertising in Filepp, as with all advertising, is to generate leads.

Claim 7 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a customer retention subsystem configured to convert an existing customer into a

---

[3] As explained in Infor's contemporaneously filed Motion for Summary Judgment of Non-Infringement, Infor understands this claim to require two separate and distinct subsystems, each performing one of the claimed functions.  If, however, SFA's proffered understanding of this claim as asserted in against Infor is correct (i.e. that one subsystem can provide both functionalities), then the asserted prior art references anticipate this claim and all the similarly structured claims calling out two subsystems with different functionality.

[4] Once again, SFA has asserted infringement against a system that functions in the same way.  In Infor's IA system, the customer is always known to the system before offers are extended.

lead, so as to generate repeat sales." '525 patent Claim 7.  As discussed above, Filepp discloses a "time with customer subsystem."

In addition, the partitioned application subsystem that displays advertisements to a customer can be used to convert existing customers into leads so as to generate repeat sales.  Filepp at col. 6, lines 45-68 and col. 9, lines 30-34; Cooke Appx. C at 20.  Mr. Thompson's report fails to address this element at all.  Thompson Report at 77-78.  Instead, in alleged "rebuttal" to this element, Mr. Thompson states that "the Filepp '632 Patent does not perform the claim element: "a lead generation subsystem configured to convert a name to a potential customer." *Id.*  A "lead generation subsystem" is not an element recited by claim 7.  Accordingly, SFA has presented no evidence opposing Infor's proof that Filepp discloses this claim element.

Claim 34 claims "a method as recited in claim 20 further comprising the steps of:  inferring occurrence of an event while converting a lead to a buying customer; and using the particular subsystem to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 34.  As described with regard to claim 5, *supra*, Filepp clearly discloses converting a lead to a buying customer.  Moreover, to the extent the system in Filepp does so, it carries out the whole process, including inferring occurrence of an event, while it does so.  Similarly, Filepp discloses converting an existing customer into a lead, so as to generate repeat sales, as discussed in claim 7.

**V.    U.S. Pat. No. 5,117,354 (Long et al.) Anticipates Claims 1-3, 5, 7, 8, 10, 12, 20, 24, 34, 35, 37, and 40**

   A.    Long Is a "Computer Implemented Sales System Used to Facilitate a Sales Process"

Long teaches a system for the pricing and ordering of goods by salespeople in the field. Cooke Report at 31; Cooke Appx. C at 51.  Mr. Thompson agrees:  "the Long '354 Patent describes a system that supported the sales person in the field facilitating the sales process for one narrow, hard-coded phase of the sales process."  Thompson Report at 104.

   B.    Long Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process"

SFA admits that Long discloses this element.  Thompson Report at 106; Thompson Tr. at

128:7-11; Cooke Report at 31; Cooke Appx. C at 51-52.

      C.    <u>Long Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."</u>

SFA admits that Long discloses this element.  Thompson Report at 107; Thompson Tr. at 128:17-129:2; Cooke Report at 31; Cooke Appx. C at 52.

      D.    <u>Long Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"</u>

In Long, once the manufacturer host (the "event manager") receives an email in either the Requests for Quotes or Orders mailbox ("detection of a change in state"), the manufacturer host then decodes each item on the order, inquiry or quote request, and, in doing so infers that an order, inquiry, or quote request occurred, and then prices each item.  Cooke Report at 31; Cooke Appx. C at 52-53.[5]  The event manager logically derives event occurrence (i.e., that an order has been placed, relative to a general inquiry, or verification that an accurate and fillable order has been placed).  Cooke Report at 31; Cooke Appx. C at 52-53.  The event manager also logically derives contexts which become relevant upon the occurrence of the event such as inventory data, accounting, credit, and/or and pricing information.  Cooke Report at 31; Cooke Appx. C at 52-53.  The host system can reassemble the file as a price quoted for transmittal.  In rebutting Infor's assertion that Long does infer occurrence of events and context, again unable to refute the obvious disclosure in Long, Mr. Thompson offers nothing more than the bald conclusion that "the system does not use inference."  Thompson Report at 108.  In explaining his denial at his deposition, Mr. Thompson explained that he was applying an understanding of "inference" that was <u>something more than the Court's construction</u> to support this conclusion.  Thompson Tr. at 129:14-134:24.  For example, Mr. Thompson states that "I don't see that Long has any rules that are implemented as rules where someone could add or even state a rule.  There are – you could say as a human that you can see that the system had codes rules

---

[5] This type of process – receipt of a request and processing of the request is characterized by SFA as inferring in its allegations of infringement against Infor's accused products.  *See* Cole Tr. at 116:20-117:1 as well as Infor's Motion for Summary Judgment of Non-Infringement.

and, for instance, you could say that if someone requests a quote, then the system will respond with a quote." *Id.* at 132:17-22. So Mr. Thompson admits that the system has rules that it uses to reach logical conclusions (i.e. a quote has been requested) from know facts (i.e. an email arrived in the quotes mailbox) but, <u>without explanation</u>, disputes that this is an inference because of his <u>invented requirement</u> that the rules must not be "hard-coded" and must allow for someone to add rules. Clearly, under the Court's claim construction (as opposed to Mr. Thompson's) Long discloses this limitation.

> E.    <u>Long Discloses "Automatically Initiating an Operation in One or More Particular Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context"</u>

Once again, Mr. Thompson concedes that Long discloses automatic initiation of operations in a subsystem, which, in this case is a provision of a price quote facilitating the action of forwarding the quote to the customer. Cooke Report at 31; Cooke Appx. C at 53; Thompson Report at 109; Thompson Tr. at 138:7-10. Mr. Thompson disputes that it is based on the inferred context, but only because he disputes that the system infers context. Thompson Report at 109. As discussed above, there is no doubt that Long infers context and initiates subsequent actions based it. Accordingly, it also discloses this claim limitation.

> F.    <u>Long Anticipates or Makes Obvious the Additional Limitations of Dependent Claims 2, 3, 5, 7, 8, 10, 12, 24, 34, 35, and 37</u>

Claim 2 and 24 include the additional limitation: "wherein the inferred context includes information related to at least one phase of the sales process." '525 patent Claim 2 and 24. Long discloses using information related to at least one phase of the sales process as inferred context by, for example, items and product IDs as context to prepare pricing information. Long at col. 4, lines 40-41; *see also* Cooke Appx. C at 54. Moreover, Mr. Thompson admits that Long discloses using such information as context: "it is clear that, in the Long '354 Patent, information relevant to a sales transaction (e.g., related to product IDs and inventory) is passed among subsystems of the sales system…." Thompson Report at 111, 131 (incorporating claim 2 into claim 24).

Claim 3 claims "a system as recited in Claim 1 wherein the inferred context includes

11

information related to whether a previous event has occurred in the sales process."  '525 patent Claim 3.  Long discloses using information related to whether a previous event has occurred in the sales process as inferred context by, for example, using a quote as context for a later event such as an order.  Long at col. 9, lines 14-16; *see also* Cooke Appx. C at 55.  Mr. Thompson admits that Long discloses inferring context:  "it is that, in the Long '354 Patent, a previous event (e.g. a quote) can result in a later event (an order)…."  Thompson Report at 112.

Claim 5 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a lead generation subsystem configured to convert a name to a potential customer."  '525 patent Claim 5.  Long discloses a "time with customer subsystem," for example, by disclosing the sales representatives' personal computers that are configured to, among other things, convert a lead to a buying customer.  Long at col. 3, lines 27-34 and col. 10, lines 37-45; Cooke Appx. C at 56; Thompson Report at 113 ("Long '354 Patent performs some of the function of the '525 Patent's 'time with customer' subsystem").

In addition, the sales representatives' personal computers are a lead generation subsystem configured to convert a name to a potential customer.  Long at col. 3, lines 27-34 and col. 10, lines 37-45; Cooke Appx. C at 56-57.  For example, the computer can be used to prepare "a bid on a particular job or project."  Long at col. 10 line 45.  Mr. Thompson states that Long does not convert a name to a potential customer but, once again, provides no support for this conclusion.  Thompson Report at 115.  Clearly, the sales representatives' computers are capable of, among many other things, facilitating the conversion of a name to a potential customer at least, for example, by preparing a bid or a quote.

Claim 7 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a customer retention subsystem configured to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 7.  As discussed above, Long discloses a

12

"time with customer subsystem."

In addition, the sales representatives' personal computers can be used to convert existing customers into leads so as to generate repeat sales.  Long at col. 3, lines 27-34 and col. 10, lines 37-45; Cooke Appx. C at 60-61.  For example, if the sales representative is dealing with a current customer when offering a bid or proposal, the subsystem would be functioning as a customer retention subsystem.  Mr. Thompson states that Long does not convert a name to a potential customer but, once again, provides no support for this conclusion.  Thompson Report at 119.

Claim 8 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer and prompting the buying customer to make a buying decision, so as to close a sale; and a self management subsystem configured to assist a salesperson in managing sales information."  '525 patent Claim 8.  As discussed above, Long discloses a "time with customer subsystem."  In addition at least, for example, by creating "submittal reports," Long discloses "prompting the buying customer to make a buying decision."  Long at col. 10, lines 37-45.

In addition, the sales representatives' personal computers can be used as a self management subsystem.  Long at col. 3, lines 27-34 and col. 10, lines 37-45; Cooke Appx. C at 62.  The computers can manage sales information such as, for example, by setting "parameters for printing and formatting of the submittal reports to be prepared for particular customers…."  Long at col. 11, lines 1-14.  Mr. Thompson states that Long does not have a self management subsystem but, once again, provides no support for this conclusion.  Thompson Report at 121.

Claim 10 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a sales management subsystem configured to assist a sales manager in managing a plurality of salespeople."  '525 patent Claim 10.  As discussed above, Long discloses a "time with customer subsystem."

In addition, the system includes a sales management subsystem.  Long at col. 6, lines 6-16;

13

Cooke Appx. C at 64-65.  For example, the system allows a sales manager to prepare a single submittal form for one customer that can be used by multiple salespeople.  *Id.*  Mr. Thompson states that Long does not convert a name to a potential customer but, once again, provides no support for this conclusion.  Thompson Report at 123.

Claim 12 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a lead management subsystem configured to manage a conversion of a lead to a prospect and of the prospect to a buying customer; and a self management subsystem configured to assist a salesperson in managing sales information."  '525 patent Claim 12.  As discussed above with regard to the disclosed "time with customer subsystem," the same analysis shows that Long discloses a "lead management subsystem" that can both manage conversion of a lead to a prospect and also of a prospect to a buying customer.  In addition, the sales representatives' personal computers can be used as a self management subsystem.  Long at col. 3, lines 27-34 and col. 10, lines 37-45; Cooke Appx. C at 66.  Similarly, as discussed above, Long discloses a self management subsystem.

Claim 34 claims "a method as recited in claim 20 further comprising the steps of:  inferring occurrence of an event while converting a lead to a buying customer; and using the particular subsystem to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 34.  As described with regard to claim 5, *supra*, Long clearly discloses converting a lead to a buying customer.  Moreover, to the extent the system in Long does so, it carries out the whole process, including inferring occurrence of an event, while it does so.  Similarly, Long discloses converting an existing customer into a lead, so as to generate repeat sales, as discussed in claim 7.

Claim 35 claims "a method as recited in claim 20 further comprising the steps of:  inferring occurrence of an event while converting a lead to a buying customer and prompting the buying customer to make a buying decision; and using the particular subsystem to assist a salesperson in managing sales information."  '525 patent Claim 35.  As described with regard to claims 5 and 8, *supra*, Long clearly discloses converting a lead to a buying customer and prompting a buying customer to make a buying decision.  Moreover, to the extent the system in Long does so, it carries

14

out the whole process, including inferring occurrence of an event, while it does so. Similarly, Long discloses converting assisting a salesperson in managing sales information, as discussed with regard to claim 12.

Claim 37 claims "a method as recited in claim 20 further comprising the steps of: inferring occurrence of an event while converting a lead to a buying customer; and using the particular subsystem to assist a sales manager in managing a plurality of salespeople." '525 patent Claim 37. As described with regard to claim 5, *supra*, Long clearly discloses converting a lead to a buying customer. Moreover, to the extent the system in Long does so, it carries out the whole process, including inferring occurrence of an event, while it does so. Similarly, Long discloses assisting a sales manager in managing a plurality of salespeople, as discussed with regard to claim 10.

**VI.**   **U.S. Pat. No. 4,567,359 (Lockwood) Anticipates Claims 1-3, 5-7, 20, 24, 34 and 40**

   A.   Lockwood Is a "Computer Implemented Sales System Used to Facilitate a Sales Process

Lockwood is a computer implemented sales system used to facilitate a sales process that allows sellers of, for example, insurance, to provide quotes to customers and sell them policies. Cooke Report at 32; Cooke Appx. C at 81-82; Thompson Report at 145. During his deposition, Mr. Thompson concedes that Lockwood is a sales system. Thompson Tr. at 138:11-140:24.

   B.   Lockwood Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process"

SFA admits that Lockwood discloses this element. Cooke Report at 32; Cooke Appx. C at 83-84; Thompson Report at 149; Thompson Tr. at 140:25-141:17.

   C.   Lockwood Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."

SFA admits that Lockwood discloses this element. Cooke Report at 32; Cooke Appx. C at 84-85; Thompson Report at 150.

   D.   Lockwood Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"

15

The central processor detects changes in state, such as, for example, receipt of an insurance quote request.  Based on this detected change in state, the processor logically infers the type of quote requested and infers what information within the system is relevant to the request (i.e. context) such as, for example, the appropriate insurance rating information necessary to facilitate the action of calculating insurance cost calculations and generating of policies.  Cooke Report at 32; Cooke Appx. C at 85.[6]  The fact that, for example, rating information is inferred as relevant is based at least in part on the detected changes of state (i.e. receipt of an insurance quote request).  Cooke Report at 32; Cooke Appx. C at 85.  Once again, Mr. Thompson does nothing more than offer the bald conclusion that Lockwood does not disclose this step.  Thompson Report at 151-52.  Also once again, when pressed for an explanation, Mr. Thompson seemed to be applying a different standard for inferring that the Court's claim construction, stating:  "I'm looking for something that admits to an <u>extensibility</u> mechanism that allows me to – allows someone, like the user or an implementer of systems <u>to add components and have communication beyond fixed exact lines of communication</u>, between fixed components…"  Thompson Tr. at 143:25-144:4 (emphasis added).  Again, intentionally going well beyond the Court's construction, Mr. Thompson does not articulate what element in the claim required "extensibility" or that ability "to add components and have communication beyond fixed exact lines of communication."  In short, the reasons that Mr. Thompson thinks Lockwood does not infer are irrelevant to the claim, as construed by the Court.

E.      Lockwood Discloses "Automatically Initiating an Operation in One or More Particular Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context"

Again, Mr. Thompson agrees that when the system provides a quote it is automatically initiating an operation in a subsystem but disputes that this is based on inferred context, solely because he disputes that the system infers context.  Thompson Report at 153.  As discussed above, the system does infer context and the automatic initiation is based on the inferred context.

F.      Lockwood Anticipates or Makes Obvious the Additional Limitations of Dependent

---

[6] Once again, this process is identical to the process described by Mr. Cole and accused of infringement relative to Infor's accused systems.

Claims 2, 3, 5-7, 24, and 34

Claim 2 and 24 include the additional limitation:  "wherein the inferred context includes information related to at least one phase of the sales process."  '525 patent Claim 2 and 24. Lockwood discloses using information related to at least one phase of the sales process as inferred context by, for example, using information related to insurance rates to prepare a quotation. Lockwood at col. 7, line 61 – col. 8, line 2; *see also* Cooke Appx. C at 87.  Moreover, Mr. Thompson admits that Lockwood discloses using such information as context:  "it is clear that, in the Lockwood '359 Patent, information relevant to a sales transaction (e.g., related to insurance rates) is passed among subsystems of the sales system…."  Thompson Report at 154 and 169 (incorporating claim 2 into claim 24).

Claim 3 claims "a system as recited in Claim 1 wherein the inferred context includes information related to whether a previous event has occurred in the sales process."  '525 patent Claim 3.  Lockwood discloses using information related to whether a previous event has occurred in the sales process as inferred context by, for example, using the basis for the insurance rates as context for offering an insurance quote.  Lockwood at col. 7, line 61 – col. 8, line 2; *see also* Cooke Appx. C at 88.  Moreover, Mr. Thompson admits that Lockwood discloses using such information as context: "it is arguable that, in the Lockwood '359 Patent, a previous event (e.g. the basis for insurance rates) can result in a later event (like the system offering an insurance quote)…."  Thompson Report at 155.

Claim 5 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a lead generation subsystem configured to convert a name to a potential customer."  '525 patent Claim 5.  Lockwood discloses a "time with customer subsystem," for example, by disclosing the video subsystem that allows customers to enter information.  Lockwood at col. 5, lines 1-12; Cooke Appx. C at 89-90; Thompson Report at 157 ("Lockwood '359 Patent

17

performs some of the function of the '525 Patent's 'time with customer' subsystem").[7]

In addition, the video subsystem is a lead generation subsystem configured to convert a name to a potential customer.  Lockwood at col. 5, lines 1-12; Cooke Appx. C at 90.  For example, if a potential lead is merely seeking information, the use of the system would be generating leads, rather than closing sales.  Again denying the obvious, Mr. Thompson states that Lockwood does not have a lead generation subsystem but, once again, provides no support for this conclusion.  Thompson Report at 158.

Claim 6 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and an order management subsystem configured to convert the sale such that a product or service delivered matches a product or service sold."  '525 patent Claim 6.  As discussed above, Lockwood discloses a "time with customer subsystem."

In addition, the system sends policy data files to each insurance company to assure that the policy ordered is the policy delivered.  Lockwood at col. 8, lines 35-39; Cooke Appx. C at 92.  Mr. Thompson states that Lockwood does not have an order management subsystem but, once again, provides no support for this conclusion.  Thompson Report at 160.

Claim 7 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a customer retention subsystem configured to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 7.  As discussed above, Lockwood discloses a "time with customer subsystem."

In addition, the video subsystem can be used to convert existing customers into leads so as to generate repeat sales.  Lockwood at col. 5, lines 1-12; Cooke Appx. C at 94.  For example, if the customer at the video subsystem is a current customer, then the system will be converting that

---

[7] Mr. Thompson's suggestion that Lockwood does not meet this limitation because there is no "salesperson" is simply incredulous.  There is nothing in the claims that requires a salesperson, nor does SFA suggest that a

119645.00604/11924458v.3

customer into a lead to generate repeat sales.  Mr. Thompson states that Lockwood does not have a customer retention subsystem but, once again, provides no support for this conclusion.  Thompson Report at 121.

Claim 34 claims "a method as recited in claim 20 further comprising the steps of:  inferring occurrence of an event while converting a lead to a buying customer; and using the particular subsystem to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 34.  As described with regard to claim 5, *supra*, Lockwood clearly discloses converting a lead to a buying customer.  Moreover, to the extent the system in Lockwood does so, it carries the whole process, including inferring occurrence of an event, while it does so.  Similarly, Lockwood discloses converting an existing customer into a lead, so as to generate repeat sales, as discussed in claim 7.

## VII.   U.S. Pat. No. 5,201,010 (Deaton) Invalidates Claims 1-3, 5, 7, 20, 24, 34 and 40

Deaton discloses a method and system for performing targeted marking to infrequent shoppers by generating an offer coupon that is targeted to a particular shopper based on information known about that shopper when an event occurs, such as a transaction involving that particular customer or some other customer contact. Cooke Report at 33; Cooke Appx. C at 109.  Mr. Thompson, again looking for elements that do not exist in the claims, disagrees stating, for example, that "there is no way described to add rules to the system or to connect it to other sales force automation subsystems as the '525 Patent teaches."  Thompson Report at 182.  Once again, however, Mr. Thompson's rebuttal bears no relevance to the language of the asserted claims, which do not require adding rules to the system or connecting to other sales force automation subsystems.

A.   Deaton Is a "Computer Implemented Sales System Used to Facilitate a Sales Process

SFA admits that Deaton discloses a computer implemented sales system used to facilitate a sales process.  Cooke Report at 33; Cooke Appx. C at 109; Thompson Report at 184.

B.   Deaton Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process"

---

salesperson is required in asserting infringement against Infor.

SFA admits that Deaton discloses a plurality of subsystems configured to facilitate actions during the sales process, which are the transaction terminals.  Cooke Report at 33; Cooke Appx. C at 109-10; Thompson Report at 184.

      C.      <u>Deaton Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."</u>

Deaton discloses a transaction processor that is an event manager that detects changes in state which are characteristic of events occurring within the system.  Cooke Report at 33-34; Cooke Appx. C at 110-11.  When a customer interacts with a transaction terminal, the transaction processor receives customer information from the transaction terminal.  Cooke Report at 33; Cooke Appx. C at 110.  This receipt of a request is a change in state.  The transaction processor then processes the customer information request.  *Id.*  Although Mr. Thompson appears to dispute this element, in fact he does not offer any meaningful opposition, stating that there is no event manager because "there is no way to add additional rules to the system to connect it to other sales force automation subsystems as the '525 Patent teaches."  Thompson Report at 186.  Again Mr. Thompson is attempting to add limitations to the claim that are not consistent with the claim language or the Court's construction.  At his deposition, however, he conceded that this was of no moment:

> So that's [the transaction processor] part of the event manager coupled to subsystems, the event manager detecting one or more changes of state characteristic to events occurring within the system.

Thompson Tr. at 153:4-10.

      D.      <u>Deaton Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"</u>

Deaton infers occurrence of events and context for example, when the transaction terminals are used to transmit a customer information request (e.g., check transaction verification) from the point of sale to the transaction processor.  Cooke Report at 33-34; Cooke Appx. C at 111.  When the request is transmitted to the transaction processor, it infers that a customer transaction is taking

20

place,[8] and the type of customer (i.e. frequent or infrequent shopper.)  Cooke Report at 33-34; Cooke Appx. C at 111-13.  In addition to performing a check verification status, the system collects and accumulates selected and current additional transactional data.  Cooke Report at 33; Cooke Appx. C at 111.  This data can include frequency of purchases and dollar amounts spent over specified intervals, along with other historical information.  Cooke Report at 33; Cooke Appx. C at 111.

The transaction processor detects a change of state; for example, detects the transmission of a check transaction verification request.  Cooke Report at 33; Cooke Appx. C at 111.  This state change is indicative of an event, such as a purchase transaction or a determination of type of customer.  Cooke Report at 33; Cooke Appx. C at 111-13.  The event manager infers the event through a logical process using rules, for example, inferring the particular store departments in which the purchased products are located, or inferring which products or store departments are absent from past or current transactions.  Cooke Report at 33; Cooke Appx. C at 111-13.

In one aspect, the transaction processor monitors sales activities, for example, assessing whether or not items have been purchased from a meat department, dairy department or deli.  Cooke Report at 34; Cooke Appx. C at 121-122.  These inferences of both event occurrence and context are ready apparent from Deaton's disclosure.  In his report, Mr. Thompson states that he does not believe Deaton satisfies this limitation, but provides no basis for that statement.  Thompson Report at 192.  When pressed for an explanation at his deposition, it became apparent once again that Mr. Thompson was looking for something more than what the Court's claim construction required to satisfy the "inferring" element:

> It is certainly possible that there's an area of -- I'll call it program logic, but by that I mean built in, <u>hard coded</u> list of case statements that are in this program that do that. So, again, if that were the case, I would not identify that as a rule and inference… But if it's just a line of code that then does the next line of code and says, well, I found that it's a threshold infrequent shopper, therefore, make a better deal for them or worse deal.  You know, some people like their frequent customers and they'll give them a better deal, some might want to entice the infrequent ones.  But if that's built into the procedural logic, then I wouldn't – I can see how someone would describe it

---

[8] Once again, this is precisely the functionality of IA that Mr. Cole claims satisfies the "inferring occurrence of events" limitation.

to their mother as one of the rules in their system, but I wouldn't accept it in the sense
of the '525 Patent as a -- <u>it wouldn't be a flexibility mechanism that allows me to add
or change my business rule</u>, so I would want to see that.

Thompson Tr. at 167:9-168:24 (emphasis added).  Once again, Mr. Thompson is looking for rules

that are not "hard-coded" and allow for a "flexibility mechanism that allows me to add or change my

business rule."  Such limitation, however, are not part of the claims or the Court's construction.

> E.      <u>Deaton Discloses "Automatically Initiating an Operation in One or More Particular
>         Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context"</u>

The system in Deaton automatically provides coupons to customers, based on inferred

context.  Cooke Report at 34; Cooke Appx. C at 118-25.

Mr. Thompson only disputes this step insofar as he disputes that the system infers.

Thompson Report at 198.  Because it is clear that the system does infer event occurrence and context,

it is equally clear that it satisfies this limitation.

> F.      <u>Deaton Anticipates or Makes Obvious the Additional Limitations of Dependent Claims
>         2, 3, 5, 7, 24, and 34</u>

Claim 2 and 24 include the additional limitation:  "wherein the inferred context includes

information related to at least one phase of the sales process."  '525 patent Claim 2 and 24.  Deaton

discloses using information related to at least one phase of the sales process as inferred context by,

for example, using new or repeat customer or frequency and dollar volume of purchases as context.

Deaton at col. 6, lines 10-24; *see also* Cooke Appx. C at 126.  Moreover, Mr. Thompson admits that

Deaton discloses using such information as context:  "it is clear that, in the Deaton '010 Patent,

information relevant to a sales transaction (e.g., new or repeat customer, frequency and dollar volume

of customer purchase) is passed among subsystems of the sales system…."  Thompson Report at 200,

235 (incorporating claim 2 into claim 24).

Claim 3 claims "a system as recited in Claim 1 wherein the inferred context includes

information related to whether a previous event has occurred in the sales process."  '525 patent Claim

3.  Deaton discloses using information related to whether a previous event has occurred in the sales

process as inferred context by, for example, using a previous event such as a customer's history

22

context for a later event such as offering a coupon.  Deaton at col. 6, lines 10-24; *see also* Cooke Appx. C at 126.  Moreover, Mr. Thompson admits that Deaton discloses using such information as context:  "it is that, in the Deaton '010 Patent, a previous event (the customer's history) can result in a later event (like the system prompting the sales clerk to offer the customer a coupon)...." Thompson Report at 202.

Claim 5 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a lead generation subsystem configured to convert a name to a potential customer."  '525 patent Claim 5.  Deaton discloses a "time with customer subsystem," for example, by disclosing the transaction terminals that are configured to, among other things, convert a lead to a buying customer.  Deaton at col. 67, line 59 – col. 68, line 12; Cooke Appx. C at 130; Thompson Report at 113 ("Deaton '010 Patent performs some of the function of the '525 Patent's 'time with customer' subsystem").

In addition, the transaction terminals are a lead generation subsystem configured to convert a name to a potential customer.  Deaton at col. 70, line 50 – col. 71, line 21; Cooke Appx. C at 131-33. For example, the transaction terminal can be used to offer a deli coupon to customers who not typically shop at the deli, thereby converting that person to a potential deli customer.  *Id.*  Mr. Thompson states that Deaton does not convert a name to a potential customer but, once again, provides no support for this conclusion.  Thompson Report at 205-06.

Claim 7 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a customer retention subsystem configured to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 7.  As discussed above, Deaton discloses a "time with customer subsystem."

In addition, the transaction terminals can be used to convert existing customers into leads so as to generate repeat sales.  Deaton at col. 67, line 59 – col. 68 line 12 and col. 70, line 50 – col. 71,

23

line 21; Cooke Appx. C at 139-41.  For example, if the customer is a current customer, offering a coupon for a product that the customer typically purchases would have the subsystem functioning as a customer retention subsystem.  Mr. Thompson agrees that Deaton discloses this limitation. Thompson Report at 212.

Claim 34 claims "a method as recited in claim 20 further comprising the steps of:  inferring occurrence of an event while converting a lead to a buying customer; and using the particular subsystem to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 34.  As described with regard to claim 5, *supra*, Deaton clearly discloses converting a lead to a buying customer.  Moreover, to the extent the system in Deaton does so, it carries out the whole process, including inferring occurrence of an event, while it does so.  Similarly, Deaton discloses converting an existing customer into a lead, so as to generate repeat sales, as discussed in claim 7.

## VIII.   U.S. Pat. No. 5,774,868 (Cragun) Anticipates Claims 1-3, 5, 7, 20, 24, 34, and 40[9]

Cragun describes generally an automated sales promotion selection system.  Cooke Report at 34; Cooke Appx. C at 200.  "The Cragun '868 Patent relates to use of an algorithm in the form of a neural network that is used to select sales promotions.  When a customer buys certain items, the system can identify additional items that other customers with similar buying profiles bought.  A neural network is trained on previous purchasing data.  Later, when a customer is making a purchase, the system uses the neural network to select other items that might be of interest and either a sales person can suggest these or a promotion or coupon can be generated."  Thompson Report at 264.

### A.   Cragun Is a "Computer Implemented Sales System Used to Facilitate a Sales Process

As Mr. Thompson again concedes, Cragun is a sales system used to facilitate a sales process. Cooke Report at 34; Cooke Appx. C at 200; Thompson Report at 267.

### B.   Cragun Discloses "A Plurality of Subsystems Configured to Facilitate One or More Actions Performed During at Least One Phase of the Sales Process"

Cragun discloses a plurality of subsystems such as, for example, neural network subsystems

---

[9] Cragun is prior art to the '525 patent under 35 U.S.C. § 102(e).

(such as a purchase advisor), customer information devices, and billing terminals.  All facilitate one

or more actions performed during the sales process.  Cooke Report at 34-35; Cooke Appx. C at 200-

02.  Mr. Thompson does not dispute this.  Thompson Report at 269.

      C.      <u>Cragun Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager Detecting One or More Changes in State Characteristic of an Event Occurring Within the System."</u>

Within the system described by Cragun, the main processor of the computer system is the

event manager.  Cooke Report at 35; Cooke Appx. C at 203.  Thompson purports to dispute this

identification of an event manager in Cragun, but in reality he is disputing that the identified event

manager has the functionality required by other elements in the claim.  Thompson Report at 271;

Thompson Tr. at 177:12-23.

      D.      <u>Cragun Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"</u>

The system described in Cragun records transaction information as a customer makes

purchases.  Cooke Report at 35; Cooke Appx. C at 205.  As items are purchased in a store, the

recorded transaction information is detected by the processor as a change in state indicative of an

event occurring within the system, specifically the purchase event.  Cooke Report at 35; Cooke

Appx. C at 205.  From the detected change in state, the system infers the occurrence of the purchase

of a certain item.  Cooke Report at 35; Cooke Appx. C at 205.  In addition, the system infers context,

which is the identification of the purchase class or classes that the particular item falls into.  Cooke

Report at 35; Cooke Appx. C at 205-08.  It is clear that the system takes known facts (i.e. the change

in state of a purchase in a certain item), applies logical rules and derives factual conclusions (i.e. that

an item in a certain class was purchased (event occurrence) or the purchase class or classes that the

particular item falls into (context)).  Cooke Report at 35; Cooke Appx. C at 205-08.

Yet again, Mr. Thompson disputes that Cragun discloses this element but provides no basis

whatsoever for his opinion; he simply states that this is "conventional technology".  Thompson

Report at 274.  Mr. Thompson, however, does not deny that Cragun uses rules, or derives factual

conclusions from known facts based on those rules.  *Id.*

      E.      <u>Cragun Discloses "Automatically Initiating an Operation in One or More Particular</u>
              <u>Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context"</u>

The event manger automatically initiates an operation in the neural network subsystem(s) to identify items that fall into the identified purchase class or classes but that are missing from the purchase transaction.  Cooke Report at 35; Cooke Appx. C at 208-11.  This operation in the neural network facilitates subsequent actions based on the inferred context such as making a purchase suggestion for one or more of the missing items.  Cooke Report at 35; Cooke Appx. C at 208-11. Again, Mr. Thompson does not actually dispute that Cragun discloses this element; he merely reiterates his position that the system does not infer, which is clearly mistaken.  Thompson Report at 277; Thompson Tr. at 189:8-16.

      F.      <u>Cragun Anticipates or Makes Obvious the Additional Limitations of Dependent Claims</u>
              <u>2, 3, 5, 7, 24, and 34</u>

Claim 2 and 24 include the additional limitation:  "wherein the inferred context includes information related to at least one phase of the sales process."  '525 patent Claim 2 and 24.  Cragun discloses using information related to at least one phase of the sales process as inferred context by, for example, using purchase data, purchase classes, and previous sales information as context to prepare pricing information.  Cragun at col. 4, lines 11-15 and lines 21-27; *see also* Cooke Appx. C at 212.  Moreover, Mr. Thompson admits that Cragun discloses using such information as context: "it is clear that, in the Cragun '868 Patent, information relevant to a sales transaction (e.g., customer purchase data, purchase classes, and previous sales by other customers) is passed among subsystems of the sales system…."  Thompson Report at 278 and 306 (incorporating claim 2 into claim 24).

Claim 3 claims "a system as recited in Claim 1 wherein the inferred context includes information related to whether a previous event has occurred in the sales process."  '525 patent Claim 3.  Cragun discloses using information related to whether a previous event has occurred in the sales process as inferred context by, for example, using a previous event such as the start of a purchase transaction as context for a later event such as issuing a coupon.  Cragun at col. 4, lines 11-27; *see*

26

*also* Cooke Appx. C at 213.  Moreover, Mr. Thompson admits that Cragun discloses using such information as context:  "it is that, in the Cragun '868 Patent, a previous event (like a customer beginning to make a purchase) can result in a later event like the system prompting the sales clerk to promote additional purchases or issuing the customer a coupon…."  Thompson Report at 279.

Claim 5 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a lead generation subsystem configured to convert a name to a potential customer."  '525 patent Claim 5.  Cragun discloses a "time with customer subsystem," for example, by disclosing the customer information devices and billing terminals that are configured to, among other things, convert a lead to a buying customer.  Cragun at col. 2, lines 32-42 and Fig. 1; Cooke Appx. C at 214; Thompson Report at 281 ("Cragun '868 Patent performs some of the function of the '525 Patent's 'time with customer' subsystem").

In addition, the customer information devices and billing terminals are a lead generation subsystem configured to convert a name to a potential customer.  Cragun at col. 2, lines 32-42 and Fig. 1; Cooke Appx. C at 215-16.  For example, these subsystems can be used to promote the purchase of additional items.  *Id.*  Denying the express disclosure of this element, Mr. Thompson states that Cragun does not convert a name to a potential customer without any support for this conclusion.  Thompson Report at 283.  In fact, Mr. Thompson agrees that "the Cragun '868 Patent is capable of promoting additional items to a customer during a sales transaction," *id.*, yet inexplicably denies that Cragun discloses this limitation.

Claim 7 claims "a system as recited in Claim 1 wherein the plurality of subsystems comprises:  a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a customer retention subsystem configured to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 7.  As discussed above, Cragun discloses a "time with customer subsystem."

In addition, the customer information device and billing terminal can be used to convert

27

existing customers into leads so as to generate repeat sales.  Cragun at col. 2, lines 32-42 and Fig. 1;
Cooke Appx. C at 221-22.  Mr. Thompson concedes that Cragun discloses this limitation.  Thompson
Report at 289.

Claim 34 claims "a method as recited in claim 20 further comprising the steps of:  inferring
occurrence of an event while converting a lead to a buying customer; and using the particular
subsystem to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent
Claim 34.  As described with regard to claim 5, *supra*, Cragun clearly discloses converting a lead to a
buying customer.  Moreover, to the extent the system in Cragun does so, it carries out the whole
process, including inferring occurrence of an event, while it does so.  Similarly, Cragun discloses
converting an existing customer into a lead, so as to generate repeat sales, as discussed in claim 7.

## IX.    U.S. Pat. No. 4,947,028 (Gorog) Anticipates Claims 1-3, 5, 7, 20, 24, 34, and 40

"The Gorog '028 Patent describes a pre-Web automated order and payment system consisting
of a collection of Order Computer Terminals (OCTs) each connected to a central computer system
(CCS).  The Order Computer Terminals provide a customer the ability to order items using a credit
card by optically scanning identification codes on items, using a keypad, or using voice for data
entry.  When an order is placed, the Central Computer System checks for product availability and
customer credit, then verifies the order with the customer and the order is placed and payment is
made.  The Gorog '028 Patent notes:  'the same process will be used for merchant to merchant
ordering and sales transactions.'  [Gorog Patent, 1: 18-20]."  Thompson Report at 327.

Once again, faced with the clear disclosure of Gorog, Mr. Thompson avoids the Court's
construction and resorts to looking for something more, not from the claims, to dispute that Gorog
invalidates the asserted claims.  In characterizing Gorog, Mr. Thompson states:  "Using this kind of
analysis, any computer program that received inputs, assigns any variable thus changing its state, and
uses any information (context) from another subcomponent to compute a result would invalidate the
'525 Patent.  *Id.* at 328.  Mr. Thompson goes on to state that this is unlike the '525 patent because
"the '525 Patent concerns a flexible scheme for sharing information and rules across subsystem

28

boundaries of a system aimed at automating a sales force." *Id.* (emphasis added).  Mr. Thompson

may well be correct – perhaps the claims of the '525 patent simply are not patentable.  Nothing in the

claims, however, requires a "flexible scheme for sharing information and rules across subsystem

boundaries of a system aimed at automating a sales force."  Moreover, Mr. Thompson's statement

ignores completely the way that SFA has asserted these very same claim elements against Infor's

accused products, which does not look for the additional items Mr. Thompson is searching so hard

for in the asserted prior art.

   A.   Gorog Is a "Computer Implemented Sales System Used to Facilitate a Sales Process

      As Mr. Thompson once again agrees, Gorog discloses a sales system used to facilitate a sales

process.  Cooke Report at 36; Cooke Appx. C at 265; Thompson Report at 330.

   B.   Gorog Discloses "A Plurality of Subsystems Configured to Facilitate One or More
        Actions Performed During at Least One Phase of the Sales Process"

      Similarly, Mr. Thompson agrees that Gorog discloses a plurality of subsystems, such as

remote programmable data input/output means including keypads, readers, display devices, and other

peripherals, configured to facilitate actions performed during the sales process.  Cooke Report at 36;

Cooke Appx. C at 266-67; Thompson Report at 331.

   C.   Gorog Discloses "An Event Manager, Coupled to the Subsystems, the Event Manager
        Detecting One or More Changes in State Characteristic of an Event Occurring Within
        the System."

      In the automated order and payment sales system described in Gorog, the software of the

order computer terminal (OCT),which is the event manager, comprises a central data processing

means with communication capability adapted to receive information from a plurality of remote

programmable data input/output means.  Cooke Report at 36; Cooke Appx. C at 266-68.  This event

manger is coupled to remote device subsystems, including the various keypad, readers, display

devices, and other peripheral equipment.  Cooke Report at 36; Cooke Appx. C at 266-68.

      Mr. Thompson again relies on a red herring, stating that "This does not seem to be equivalent

to the '525 Patent's event manager that is capable of integrating a collection of sales processes and

that uses inferences rules." Thompson Report at 333.  Once again, Mr. Thompson is looking for more than the claims require.  Accordingly, Mr. Thompson essentially admitted at his deposition that Gorog has an event manager.  Thompson Tr. at 190:17-191:15.

      D.      <u>Gorog Discloses "Inferring Occurrence of the Event and a Context in Which the Event Occurred Based at Least in Part on the Detected Changes in State"</u>

The OCT software detects a change in state when receiving an incoming order packet.  The change of state is indicative of an event (i.e., that a valid and fulfillable order has been placed).  Cooke Report at 36; Cooke Appx. C at 269-70.  Order packet data is divided into order data (i.e., information relating to the merchant, identification of the goods or services, and the amount of items desired) and payment data.  Cooke Report at 36; Cooke Appx. C at 269-70.  Processing software infers the occurrence of a valid and fulfillable order, based upon records of inventories provided by participating businesses, or by sending a query to other computers holding the necessary data records for participating businesses, and by verifying payment mediums selected.  Cooke Report at 36; Cooke Appx. C at 269-70.  Upon occurrence of the event, the software logically derives relevant contexts based upon the detected changes in state (i.e., receiving the incoming order packet).  Cooke Report at 36; Cooke Appx. C at 269-70.  Contexts include inventory data and credit data, as described above.  Cooke Report at 36; Cooke Appx. C at 269-70.

Again, Mr. Thompson relies on bald conclusions and no analysis to dispute this conclusion, simply stating that "the Gorog '028 Patent does not describe inferring occurrences of events or using a context mechanism."  Thompson Report at 335.  Again, even if true, the fact that "the '525 Patent concerns a flexible scheme for sharing  information and rules across the subsystem boundaries of a system aimed at automating a sales force,"  Thompson Report at 335, is simply irrelevant because it is not required by the claims.  Similarly, even if true, the fact that "the Gorog '028 Patent describes conventional technology for connecting subsystems in a system," *id.*, does not preclude Gorog from being invalidating prior art if it discloses all the elements of the claims, which it clearly does.  Ultimately, even Mr. Thompson recognized that these "limitations" do not appear in the claims.

30

Thompson Tr. at 193:24-194:25 ("no, I'm reading that in…")

E.   Gorog Discloses "Automatically Initiating an Operation in One or More Particular
     Subsystems of the Computer to Facilitate a New Action Based on the Inferred Context"

Gorog automatically initiates operations such as transmission of order data and payment

authorization information among the subsystems, and to product/service providers, all facilitating the

action of completing and satisfying the order.  Cooke Report at 37; Cooke Appx. C at 270.  Once

again, Mr. Thompson's rebuttal is nothing more than a reiteration of his opinion that there is no

inference.  Thompson Report at 336; Thompson Tr. at 195:20-23.

In the final analysis, Infor has provided coherent, specific citations to show that each and

every piece of asserted prior art discloses all the limitations of the asserted claims, at least in view of

the Court's claim construction and specifically how SFA has conceived of those claims when

asserting them against Infor's products.  In the face of this clearly invalidating prior art, SFA has

resorted to two primary tactics:  (1) having its infringement expert apply a different understanding of

the claims than its invalidity expert; or (2) rebutting the explicit disclosure of the prior art with Mr.

Thompson's blind denial, unsupported by facts, substance, or reality.  Simply denying that a certain

element is not present, without any support, cannot and does not create a genuine issue of material

fact that would preclude summary judgment of invalidity.  *See* Fed. R. Civ. P. 56; *First Nat'l Bank v.

Cities Serv. Co.*, 391 U.S. 253, 288 (1968) (adverse party cannot rely on mere denials, but must set

forth specific facts showing there is a genuine issue).

F.   Gorog Anticipates or Makes Obvious the Additional Limitations of Dependent Claims
     2, 3, 5, 7, 24, and 34

Claim 2 and 24 include the additional limitation:  "wherein the inferred context includes

information related to at least one phase of the sales process."  '525 patent Claim 2 and 24.  Gorog

discloses using information related to at least one phase of the sales process as inferred context by,

for example, using customer and product identification as context for fulfilling an order.  Gorog at

col. 6, lines 37-51; *see also* Cooke Appx. C at 271.  Mr. Thompson admits that Gorog discloses using

such information as context:  "it is clear that, in the Gorog '228 Patent, information relevant to a

31

sales transaction (e.g., customer and product identification) is passed among subsystems of the sales system….” Thompson Report at 337 and 353 (incorporating claim 2 into claim 24).

Claim 3 claims “a system as recited in Claim 1 wherein the inferred context includes information related to whether a previous event has occurred in the sales process.” ‘525 patent Claim 3. Gorog discloses using information related to whether a previous event has occurred in the sales process as inferred context by, for example, using a previous event such as an order as context for a later event such as order confirmation. Gorog col. 6, lines 37-51; *see also* Cooke Appx. C at 272. Moreover, Mr. Thompson admits that Gorog discloses using such information as context: “it is that, in the Gorog ‘228 Patent, information relevant to a sales transaction (e.g., customer and product identification) is passed between the remote OCT terminal and the central CCS computer and, in a later step, back again for order confirmation….” Thompson Report at 339.

Claim 5 claims “a system as recited in Claim 1 wherein the plurality of subsystems comprises: a time with customer subsystem configured to convert a lead to a buying customer, so as to close a sale; and a lead generation subsystem configured to convert a name to a potential customer.” ‘525 patent Claim 5. Gorog discloses a “time with customer subsystem,” for example, by disclosing an order computer terminal (“OCT”) configured to, among other things, convert a lead to a buying customer. Gorog at col. 2, lines 54-68 and col. 9, lines 8-30; Cooke Appx. C at 273; Thompson Report at 340 (“Gorog ‘028 Patent performs (some of) the function of the ‘525 Patent’s ‘time with customer’ subsystem”).

In addition, the OCT is a lead generation subsystem configured to convert a name to a potential customer. Gorog at col. 2, lines 54-68 and col. 9, lines 8-30; Cooke Appx. C at 273-74. For example, the OCT can be used to assist the customer in preparing the order. *Id.* Mr. Thompson states that Gorog does not convert a name to a potential customer but, once again, provides no support for this conclusion. Thompson Report at 342.

Claim 7 claims “a system as recited in Claim 1 wherein the plurality of subsystems comprises: a time with customer subsystem configured to convert a lead to a buying customer, so as

119645.00604/11924458v.3

to close a sale; and a customer retention subsystem configured to convert an existing customer into a lead, so as to generate repeat sales." '525 patent Claim 7.  As discussed above, Gorog discloses a "time with customer subsystem."

In addition, the OCT can be used to convert existing customers into leads so as to generate repeat sales.  Gorog at col. 2, lines 54-68 and col. 9, lines 8-30; Cooke Appx. C at 277-78.  For example, if the OCT is dealing with a current customer, the subsystem would be functioning as a customer retention subsystem.  Mr. Thompson states that Gorog does not convert a name to a potential customer but, again, provides no support for this conclusion.  Thompson Report at 346.

Claim 34 claims "a method as recited in claim 20 further comprising the steps of:  inferring occurrence of an event while converting a lead to a buying customer; and using the particular subsystem to convert an existing customer into a lead, so as to generate repeat sales."  '525 patent Claim 34.  As described with regard to claim 5, *supra*, Gorog clearly discloses converting a lead to a buying customer.  Moreover, to the extent the system in Gorog does so, it carries out the whole process, including inferring occurrence of an event, while it does so.  Similarly, Gorog discloses converting an existing customer into a lead, to generate repeat sales, as discussed in claim 7.

## X.   The Asserted Claims are Obvious

First, to the extent any of the asserted claims are not anticipated by any of the asserted prior art references, any differences between the asserted prior art and the asserted claims would have been obvious to one of skill in the art, either from the reference alone or any number of combinations of the asserted references, rendering the claims invalid under 35 U.S.C. § 103.  Cooke Report at 5.

Moreover, Spezialetti, Madalene: An Approach to Reducing Delays in Recognizing Distributed Event Occurrences, in combination with any one of the other asserted prior art references renders the asserted claims obvious.  Spezialetti discloses a strategy to help systems recognize the occurrence of complex events faster.  Thompson Report at 407.  Spezialetti accomplishes this by

inferring the occurrence of events, as admitted by Mr. Thompson.  Thompson Report at 413.[10]

     In view of this admission, SFA (through Mr. Thompson) has admitted that all of the elements of the asserted claims are disclosed in a combination of Spezialetti with any of the other asserted references.  Accordingly, the asserted claims are obvious and invalid under 35 U.S.C. § 103.

## XI.   <u>Conclusion</u>

     For all the forgoing reasons, Infor respectfully requests that the Court grant summary judgment in its favor of invalidity of all the asserted claims.

Date:   August 10, 2009              Respectfully submitted,

                              /s/ Alfred W. Zaher
                              Alfred W. Zaher
                                 Pa. Bar No. 73814
                                 zaher@blankrome.com
                              Bruce D. George
                                 Pa. Bar No. 84320
                                 george@blankrome.com
                              Joel L. Dion
                                 Pa. Bar No. 200477
                                 dion-j@blankrome.com
                              Nakul Krishnakumar
                                 Pa. Bar No. 201311
                                 krishnakumar@blankrome.com
                              BLANK ROME LLP
                              One Logan Square
                              Philadelphia, PA 19103
                              Phone:  (215) 569-5500
                              Fax:  (215) 569-5555

                              Mike Jones
                              Texas Bar No. 10929400
                              mikejones@potterminton.com
                              Diane DeVasto
                              Texas Bar No. 05784100
                              dianedevasto@potterminton.com
                              POTTER MINTON, P.C.
                              500 Plaza Tower
                              Tyler, Texas 75702
                              Phone:  (903) 597-8311
                              Fax:  (903) 593-0846

---

[10] Apparently recognizing the significance of this admission, Mr. Thompson attempted to back away from it at his deposition, but could not credibly deny that Spezialetti disclosing inferring occurrence of events.

**ATTORNEYS FOR DEFENDANTS
INFOR GLOBAL SOLUTIONS (CHICAGO),
INC. AND INFOR GLOBAL SOLUTIONS
(MICHIGAN), INC.**

119645.00604/11924458v.3

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with this document pursuant to L.R. CV-5(a)(7) on this 10th day of August 2009.  Any other counsel of record will be served by facsimile transmission.

/s/ Alfred W. Zaher
Alfred W. Zaher

36