**Exhibit 5**

Page 1

UNEDITED, UNCERTIFIED, ROUGH DRAFT ONLY

Deposition of 7-21-2009.  Direct by George.


                VIDEOGRAPHER:  Today is July 21st, 2009.

This is the videotaped deposition of Craig Thompson

taken in the case of SFA Systems, LLC versus Infor

Global Solutions, Incorporated, et al., Civil Action No.

6:07 CV 067.  The time is 10 o'clock a.m.  We're on the

record at Thomspon & Knight in Dallas, Texas.  We're on

the record.

                CRAIG WARREN THOMPSON,

having been first duly sworn, testified as follows:

                MR. GEORGE:  I'm Bruce George of Blank Rome

Philadelphia for Defendant, Infor Global Solutions, with

me is Joel Dion, also with Blank Rome.

                MR. PRIDHAM:  David Pridham here on behalf

of the Plaintiff.

                THE WITNESS:  I'm Craig Thompson.

                      EXAMINATION

BY MR. GEORGE:

     Q.  Hi, Dr. Thompson, thanks for coming today.

Just to get started, when were you first retained in

this matter?

     A.  The very end of April, I think, the 30th.

     Q.  Who contacted you?

1    change that a little bit, where -- change of topic a

2    little bit, leave Spezialetti maybe alone for a little

3    bit.  Let's start, if you would, I guess, what I'd like

4    to do is maybe go through the prior art portions of your

5    report.

6         A.  Okay.

7         Q.  And just address or clarify your analysis for

8    say the claim elements, primarily directed, you're using

9    Claim 1 as say the representative claim for the

10   independent claims, you would agree most of those

11   are similar?

12        A.  Somewhat related.

13        Q.  So we'll be able to do that.  Let's see,

14   starting with --

15        A.  You have the advantage of tabs.

16        Q.  Yeah.  No, I'll tell you.  I'll tell you the

17   page.  Let's see.  I'll try to walk you through it.

18   Maybe we'll get through it quicker that way, too?

19        A.  Okay.

20        Q.  Okay.  On page 56, just addressing the

21   preamble.  Do you dispute that fully describes the

22   preamble of Claim 1, which is a computer implemented

23   sales system used to facilitate the sales process, the

24   system comprising?

25             MR. PRIDHAM:  Object to form.

1          A.   Phillipe is a -- the Phillipe patent describes

2     the prodigy online system circa 1989 or '90, somewhere

3     in that time frame, which is like -- could be thought of

4     as an analog to the worldwide web.  That is, there might

5     be a client that sits on a user's machine and a server

6     back at some central place, and as such, primarily

7     Phillipe is directed at describing the reservation

8     system or client interface, is what they call it.  But

9     I'll call it the client interface or the browser like

10    interface.  So I think Phillipe is primarily directed at

11    describing how their servers and their clients

12    communicate.

13              So I don't see that Phillipe is primarily

14    targeted at -- it is certainly computer implemented

15    system, but I don't see that it is primarily targeted at

16    a sales system used to facilitate a sales process.

17         Q.   Does Phillipe disclose any part of a sales

18    process?

19         A.   At a few points, maybe one or more points in

20    Phillipe he mentioned that you might be able to do, and

21    I can't remember his list, but banking is among them,

22    and for instance, and so if one understands what the web

23    is now and sort of considers -- oh, I think weather

24    might be another one, but if you consider web pages

25    nowadays and assume that they get used for any purpose

1   of for small information or banking or stocks or

2   whatever, then by analogy you'd have to believe that the

3   prodigy system could be used for system -- for uses like

4   that.  I don't think that the Phillipe patent goes into

5   any detail on any of those.  I think they call them

6   partitioned applications.

7        Q.  Uh-huh.  Okay.  Moving to Claim 1, element A.

8   Is it correct that you dispute that Phillipe performs

9   this claim element?

10       A.  Let me review.  I think it says I just said

11  that in fact certainly the case that Phillipe describes

12  an overarching system that consists of plurality of

13  systems and that they configured in some way and they

14  facilitate something and they might facilitate actions

15  and so that part is certainly the case.

16            Now, as I said, it was analogous to a web

17  browser, that is, it was like prodigy's the description

18  of that prodigy online system.  So I don't think that it

19  was directed to performing these partitioned

20  applications as during at least one phase of a sales

21  process.  I don't think it's directed in that way.

22  That's not the emphasis.  It's certainly possible that

23  someone could use it to implement a step or a phase of a

24  sales process.

25       Q.  Okay.  Moving to one B.  An event manager

1  coupled to the subsystems, the event manager detecting
2  one or more changes in state characteristic of an event
3  occurring within the system.
4      A.  And your question?
5      Q.  And your analysis is on 62.  You do agree that
6  it performs -- that Phillipe performs this claim
7  element?
8      A.  Phillipe is clear that there is an event
9  manager.  They describe it in some detail here and there
10  and give some examples.  And so I don't dispute that
11  they have an event manager that detects one or more
12  changes in state characteristics of events that occur in
13  the system.  Most of their examples are directed to
14  those traditional graphical user interface events, like
15  scrolling down a page, which is a major portion of what
16  the Phillipe browser like interface, when they describe
17  it, they're describing blocks of data filling up parts
18  of the page and browsing capability, and so on.  So they
19  are using that event manager for at least recognizing
20  those graphical user commands, which were prior art, in
21  my view.  I don't think they're -- I don't know that
22  they were claiming them.  So, yes, I don't dispute that.
23      Q.  Okay.  Element C.  Inferring occurrence of the
24  event in a context in which the event occurred based at
25  least in part on detected changes in state.  Your

1    manager detects, infers and initiates.  So the event
2    manager is not different than -- or rather it's
3    different in some sense, it is a structure that performs
4    all three of these families of actions, which -- one of
5    which is inferring.  I didn't see if the Phillipe patent
6    providing the inferring step, as we said, it does
7    provide a detecting step, but not -- there's no real
8    evidence of the inferring step.  So I didn't see that
9    once it detects something that it does anything more
10   than to take a procedural sequence of steps as actions.
11   I mean, that's what I would presume it -- I mean, in the
12   absence of anymore description, it didn't look like it
13   was checking the antecedents of what had just happened,
14   the event that had just happened against a rule base and
15   taking an action.
16        Q.  You do use the term in this prior art, and
17   maybe I can find a cite as we move forward, but let me
18   ask now, you do often say that the prior art does not
19   teach or does not disclose an inference mechanism.
20        A.  Or perhaps --
21             MR. PRIDHAM:  Object to form.
22        A.  -- provide -- I was, as an expert, looking for
23   an inference mechanism, a rules -- in a rule base, some
24   reasoning component that might be using such things,
25   some evidence that went beyond a conventional event

1  driven, that is, listening, followed by a direct
2  handling that would be thought of as procedural
3  collection of steps.  Was looking for some indirection
4  there that would add flexibility to the system, where
5  the business rules or inferences or the knowledge would
6  be that could provide that indirection or sharing or
7  other.  And I didn't really see any mechanism like that
8  fully.
9      Q.  Okay.  So the term inference mechanism, I'm
10 thinking when you use the term mechanism, some kind of
11 component or structure.  What would an inference
12 mechanism be or could it be?
13     A.  Among other things, it could be an inference
14 engine with a rule base, or, alternatively, it could be
15 entries into a semantic web knowledge base or and it
16 could somehow indirectly call some learning mechanism or
17 something beyond just calling a fixed procedural set of
18 steps, so it could have been potentially more than --
19 well, more than what I viewed as they say how prior art
20 would have done it, if that's all I was seeing in '525,
21 I would have said, well, I think we already have one of
22 those.  But I didn't see an example of a distributed
23 system.  I didn't see any of the eight references an
24 example of a directed system that when it recognized a
25 situation that it detected a new -- that a context was

1   implemented sales system used to facilitate a sales

2   process, the system comprising.

3        A.  I did agree to that.

4        Q.  Okay.  You do have the caveat, for one narrow

5   hard coded phase of the sales process.

6        A.  I do.

7        Q.  Okay.  All right.  Element A.  The plurality of

8   subsystems configured to facilitate one or more actions

9   performed during at least one phase of the sales

10  process.

11       A.  I agree.

12       Q.  You do agree that Long performs that element.

13  Thank you.

14       A.  Again, for that one -- or for a narrow phase of

15  the sales process in that /REULGDZ way.

16            Check.

17       Q.  Okay.  Element B.  An event manager coupled to

18  the subsystems.  The event manager detecting one or more

19  changes in state characteristic of an event occurring

20  within the system.  You do agree that Long performs that

21  claim element.

22       A.  Yes.  It was certainly an event manager.  It

23  does a very simple kind of event managing.  It's

24  implemented by polling e-mail, I think we talked about

25  that many hours ago and -- but it does have event

1    manager, even though I believe they don't mention

2    events, event managers or event management.  Now that I

3    think of it, that thing that does the polling, I would

4    have to go back and look to see whether it's coupled to

5    the subsystems, that is, as if a separate box, if you

6    will, in this architecture diagram or whether it's more

7    like integrated or just a pile of code that's kind of

8    tied closely to the systems on the claim in the server

9    site.  I might have to review that aspect.  But

10   generally, there is something that conceptually would

11   recognize these simple events, like poll for an e-mail

12   message that says, this is a request for quote or this

13   is an order.

14        Q.  Okay.  Thank you.  Element C.  Inferring

15   occurrence of the event in the context in which the

16   event occurred based at least in part on the detected

17   changes in state.  Okay.  You do believe Long does not

18   perform this claim element.

19        A.  Yes.  I again do not see any description in the

20   Long patent of any inference or rule or expert system or

21   knowledge base or something or learning.

22        Q.  Okay.

23        A.  I just see these hard coded events.

24        Q.  In the middle of 108, you mention, the system

25   does not provide a mechanism for inferring, context or

1   rules.  I just want to clarify.  Were you looking for a
2   mechanism for context?
3        A.   Actually, I suppose I could back off from the
4   word context.  It does have an extremely simple notion
5   of event detection, and context is getting out that
6   notion of, in this situation, do something.  And there
7   is a notion that's simple, very simple about context.
8   It's basically, hold this e-mail and see if it says it's
9   an order event or it's a request for quote event.
10            So, in that sense, it's a hard coded --
11  it's not a separable context mechanism, but it's kind of
12  a hard coded one.  So, whether I would call that a
13  mechanism or pull it out, it's pretty darn hard coded
14  into the system.  There's no indirection for knowledge,
15  no way to insert business rules there, that I see.
16       Q.   Okay.  And in this context -- that maybe wasn't
17  a good word -- but you are referring, when we're
18  speaking of here a mechanism for context, context as the
19  Court's construed it, in that a context is information.
20       A.   Uh-huh.
21       Q.   Not like a contextual mechanism of some kind.
22       A.   Right.  I see it as the information often in
23  rule systems, upon this condition in this context, could
24  be another statement of when this information is
25  present.  So, in that sense, there might be a thing

1  looking to see if that context is there.  Well, here,
2  there are two hard coded if statements of the
3  conventional variety that say, after we find out that
4  there's a polling event and there's an e-mail here, see
5  whether it's a request for quote.  See if the subject
6  line says request for quote.  I mean, it's so hard coded
7  that it's not a general capability that you could use to
8  tie the system to other systems or anything like that.
9  It's -- that's what I meant earlier on when I said it
10  was a narrow and fixed system.  It has the
11  functionality, it has -- it doesn't really have an
12  extensibility mechanism for adding new modules,
13  integrating them in with rules, so I was looking for
14  such a capability here and only finding something that
15  looked very much like conventional technology in that
16  regard.  And I don't think that patent was aimed at and
17  they didn't seem to be claiming that they had a new kind
18  of notification or event or some other system.  They
19  were just more claiming that they had a system that
20  could allow you -- people in the field to customize
21  requests for complex stuff that they were going to
22  order.  So they were more about -- I mean, their
23  emphasis on that patent was in a different place, so
24  they were just describing how they did it and they were
25  using conventional technology, in my view.  Since it was

1    supposedly prior art, I was comparing it -- Cook's
2    description of it and then the actual patent, I was
3    comparing it to see whether it matched up with what I
4    took to be the -- I'll say focus that we see in these
5    independent claims of the '525 Patent as looking for
6    those concepts.  And so, I mean, essentially, the form
7    of inference isn't really present there.  We could
8    quibble about the other things, about whether it
9    detects, whether it really detects or whether it's just
10   a procedural step.  It doesn't have sort of a separable,
11   extensible, reprogrammable detection mechanism anyway.
12   I suppose I said more than you wanted to hear.
13        Q.   Would it be -- could it use a rule to simply do
14   a detection for a procedural step?
15        A.   Could what do that?  Could the Long patent?
16        Q.   Could Long?
17        A.   I don't see that Long has any rules that are
18   implemented as rules where someone could add or even
19   state a rule.  There are -- you could say as a human
20   that you can see that the system hard codes rules and,
21   for instance, you could say that if someone requests a
22   quote, then the system will respond with a quote.  We
23   humans would recognize that as a kind of a high level
24   rule, but that's so built into the system that that is
25   the only action that occurs, and there is no

1  extensible -- it's not like a statement of rule, it's

2  more like -- I mean, if that were what we meant by rule

3  here, almost everything in any program that we ever

4  wrote could be thought of as, if I execute this step,

5  then I'll execute the next one.  If I execute this one,

6  I'll execute the next one, and we would have billions of

7  rules.  And then we wouldn't really need to talk about

8  rules, because they'd be everywhere.

9       Q.  In your view, what are we referring to when we

10  speak about rules here?

11            MR. PRIDHAM:  Object to form.

12       A.  In my view, the Court talks about logical rules

13  and the patent talks about -- gives a few examples of if

14  then kinds of rules, and it mentions inference, so it

15  seems to allow for rules not only of the kind if

16  antecedent then fact, also if antecedents then action,

17  so I believe that these separate -- what we might call a

18  rule base or collection of rules might well be a common

19  way to implement the inferring mechanism.  Maybe not the

20  only way, but certainly if we never saw anything like

21  that, we would be sort of saying, well, what did we gain

22  in the '525 Patent from that?  It was this separating

23  out of this business logic that is now encoded in these

24  separately specifiable rules that are fairly easy to

25  change, as opposed to writing programs, which is -- uses

1   a programmer.  And so often in the AI world, we think of

2   declarative knowledge as easier to specify, and it

3   doesn't -- it's not really tied to a particular way it's

4   going to be used.  We just state it, and then it's

5   modularly there.  And so often I would be looking for

6   some kind of a mechanism for encoding relationships like

7   facts or relationships like if this happens, then this

8   is true or do this.

9                    So if I don't see anything like that, which

10  is what I was looking for, I didn't see it in Long, so

11  essentially it's a sales automation step that helps a

12  salesperson work with a client in the field who has a

13  complex problem to specify.  But it looked like it was

14  primarily using, while it used multiple components, it

15  was using conventional technology.  And it wasn't so

16  much that it was introducing a way of integrating

17  systems, because there are only a fixed number of

18  systems and they're so hard coded together that it does

19  exactly what it does and it does no more, and there's

20  nothing in the patent that talks about being able to add

21  more functionality, whereas there's a presumption core

22  in this patent, at least in this specification, that

23  it's an integrated technique for hooking together

24  modules in a sales automation world.

25       Q.   Okay.  Thank you.  You did mention earlier in

1    of the word inference in context of the predecessor

2    claim element, again, I'm looking for, in view of the

3    '525 Patent, I'm looking for some mechanism capability

4    portion of the system where I could discern that that is

5    a coupled event manager subsystem that has these

6    properties and I really didn't see evidence of that.

7              So it's not that I object to the initiating

8    to facilitate a new action, because you can see that in

9    some sense it does, the predecessor event causes another

10   action.  It's just that I think that it's hard wired.  I

11   don't see it as the result of rules or inference or what

12   I take to be the inference portion of this.

13        Q.  Okay.  Thank you.  Okay.  Let's move on to

14   Lockwood.  Before we start, for each of these pieces of

15   art, we're looking at claim one, we're talking about the

16   preamble and then the elements.

17        A.  Okay.

18        Q.  Do you have a view of whether the preamble or

19   the limitations included in the preamble should be

20   required or are required?

21              MR. PRIDHAM:  Object to form.

22        A.  This is a broad question about all of these?

23        Q.  Yeah.  About the preamble, generally.

24        A.  I don't know if that's a legal question,

25   whether preamble's are treated distinctly from the --

1    I'll call it the rest of the element.  So as I come into
2    separately on the preamble, and I don't know whether
3    that's something that the Court decides, whether it's
4    known and it's always true or whether it's never true, I
5    don't know.  But I did comment on it in each case, so I
6    have an opinion about each case, but just don't know
7    legally the status of the preamble.
8         Q.  Fair enough.  So you commented based on what
9    was there and whether it might be disclosed.
10        A.  Right.
11        Q.  Okay.  So the preamble for Lockwood.
12        A.  I guess I did say the Court has not construed
13   this preamble, so I presume that the Court has or could
14   have or might have come into or it must be relevant, so
15   I suppose I knew that and I think the lawyers and I
16   talked about including that phrase, so we included it or
17   I included it, but again, my own -- even at this moment
18   is what I said, I don't know the status of the
19   importance of that preamble.
20        Q.  Okay.
21        A.  In each of them.  Okay.  So your question?
22        Q.  So for the preamble for Claim 1, do you believe
23   Lockwood discloses the preamble?
24        A.  Let me just take a quick read, but -- largely.
25   So, it is computer implemented, it's a sales system,

1   it's used to facilitate a sales process.  And so in that
2   I'd say largely, mostly sense, it is that.  In the
3   largest spirit of the patent overall, like the title
4   says, sales automation, and to some extent, and
5   interested in situations where the claims help automate
6   the entire -- and I'll say larger sales process, I'm
7   thinking that the patent in its more broad and normal
8   sense could potentially be used to help in several
9   phases and with salespeople involved.  So the thing that
10  Lockwood doesn't do, it's kind of a kiosk system where a
11  user is a customer at a mall or an auto sales place or
12  wherever, and they sit down, they interact with the
13  system, sort of like we do on the web, only this is pre-
14  web, and so the system when people thought about kiosks
15  are sort of specialty systems were remotely talking to a
16  special application.  It's kind of like going to a place
17  and shopping, you know, at the library or something, but
18  you don't get to shop at home.
19            Anyway, because it's kiosk oriented, it's a
20  narrower kind of sales automation, but it certainly
21  automated sales.  And so the answer is, to make our day
22  shorter, it's a special case of what the more general
23  case is about, I think, admits to or is in depth.
24  But -- so it will be true of the Lockwood system.
25       Q.   Okay.  Element A.  On page 149, you mention

1    that Lockwood arguably performs this element.  Could you

2    explain, I guess, how they arguably describe affects

3    your answer?

4         A.  Let me read this again.  Plurality -- certainly

5    has that.  Facilitate one or more actions during at

6    least one phase of the sales process.  In their world,

7    it was pretty much one phase as a sales process, which

8    was endurance -- I mean, the application that they

9    mostly talk about was -- I think it could have been

10   others, but certainly was getting quotes for insurance

11   and maybe possibly buying the insurance remotely.  And I

12   suppose it's kind of mean to say arguably.  It executes

13   this, and I was admitting that.  It is, again, as -- I

14   guess it's sort of looking forward to later on elements,

15   but it's a hard coded system, again.  It's a distributed

16   system with a remote kiosk.  It doesn't have

17   salespeople, but it meets these claim elements.

18        Q.  Okay.  Thank you.  For element B, on 150, you

19   do state that Lockwood performs this claim element.

20        A.  Yes.  Let me remember -- maybe it won't matter.

21   I think it's a distributed message passing system, so

22   instead of using e-mail as the communication, I think it

23   just uses a little higher level protocol that's more

24   sort of not something humans usually use but more like

25   subpoena row between calls the messages back and forth

1      Q.   Okay.  For element C, at the bottom of page

2  151, you state that Lockwood does not perform this claim

3  element.  You state just below that, Lockwood does not

4  mention event trigger rule, in parens, for context.

5            How much of your opinion that Lockwood does

6  not perform this claim element is based on the fact that

7  the patent does not mention event trigger, rule,

8  inference or context?

9            MR. PRIDHAM:  Object to form.

10     A.   One of the tests I did with each of the patents

11  was simply to see what words they used and look for

12  words that seemed to me to be indicators that some

13  functionality was there.  But another test I made was, I

14  read the patents carefully and I looked for mechanisms,

15  possibly described differently than these words.  And

16  so, I'm just reporting here that I didn't see evidence

17  in the words that they used, and truly I didn't see

18  evidence of any mechanism when I was reading the patent

19  that would implement the inferring kind of layer that

20  we've been talking about.

21     Q.   And when you say "mechanism," are you referring

22  to structure or a component?

23     A.   I'll say a functionality.  It could be a

24  structure or a component or even a hard coded procedural

25  logic.  I'm looking for something that admits to an

1   extensibility mechanism that allows me to -- allows
2   someone, like the user or an implementer of systems to
3   add components and have communication beyond fixed exact
4   lines of communication, between fixed compoments, and in
5   Lockwood, there seemed to be only the kiosk and the back
6   end, I forget what they called it, but back in the
7   computer environment might be several kiosks, of course,
8   but there was limited functionality that the kiosk did
9   that would show you insurance quotes, let you specify
10  what you wanted, get a quote, then possibly let you buy
11  it, as I kind of recall.
12              And so that was a fixed family of
13  functions, and again, I didn't see any inferring
14  mechanism, functionality, layer, any part of the system,
15  any of those kinds of things to latch onto and say, oh,
16  there it is.  That's the part of the system that does
17  these things.  That would be analogous for part of the
18  system over here.  In fact, the '525 that does that.  I
19  didn't find such a part.
20      Q.  Using that analogy, what parts of the '525 do
21  perform that functionality?
22      A.  Well, for instance, in the '525, in just Claim
23  1, we've been talking quite a bit today about an event
24  manager that among other things that's an inferring step
25  in the '525 when we were reading the body of the patent.

1  for that customer that may be related to that purchase.

2  Okay.  So that's the -- so it is a computer implemented

3  sales system using sales, facilitates the sales process,

4  so the preamble is met.

5      Q.  Okay.  For element A, at the bottom of page

6  184, you do agree that Deaton performs Claim 1, element

7  A.

8      A.  I have my usual narrow phase of -- meaning

9  that, again, it's brittle, like these older systems, it

10  does exactly what it does but it's not naturally

11  extensible to -- it's kind of like the things that they

12  talk about at the beginning of this patent, '525 Patent,

13  where they talk about predecessor systems that could do

14  limited functions.  This one, again, does two kinds of

15  functions.  One is recognizing that it's seen a

16  customer, keeping track of them, into giving them some

17  coupons.  So, yeah, it meets the -- but it's limited.

18  It has a plurality of systems.  They do what the claim

19  element says.

20      Q.  Okay.  For element B, at the top of page 186,

21  you state that Deaton does not perform this claim

22  element.  And in the second paragraph, you mention that

23  Deaton is not directly -- or not directed to sales force

24  automation.  Is that a strong basis for your opinion?

25              MR. PRIDHAM:  Object to form.

1  current transactions.

2       A.   Okay.  Would have been helpful here looking now

3  and in light of the late hour of the day if he had

4  actually provided a reference to where that would have

5  been because then I would go read that.  Now, if there

6  is an area of the patent where there is a list of rules

7  that do that kind of thing, I would be interested in

8  looking back at it.

9            It is certainly possible that there's an

10  area of -- I'll call it program logic, but by that I

11  mean built in, hard coded list of case statements that

12  are in this program that do that.  So, again, if that

13  were the case, I would not identify that as a rule and

14  inference, because I would say that that's where we

15  would be reading in inference by just using that word in

16  a human like way.  And I would say if a system doesn't

17  implement a way to do this based on these declarative

18  statements, then I wouldn't accept it as inferring and

19  rules and so on.  So it would depend on -- now, I would

20  go back and, you know, I'm interested, I'll be

21  interested in going back to look at this to see whether

22  there is anything there, although it might take me a

23  long time, because he didn't give me reference.  Would

24  have been nice to have that.  So I wouldn't accept it on

25  face value just because he said it, because sometimes in

1    other places he said things like this that might have --
2    okay.  I ran a piece of code that looked in the database
3    and got for this customer that they're an infrequent
4    shopper.  That's a normal query in a database.  I could
5    use conventional queries and that might be a line of
6    code.  See if this is a traditional shopper because they
7    don't show up very often by some threshold.  You could
8    write a little line of code that would do that.  It
9    could be a rule or part of a rule, the ability to add
10   more such rules or the ability to change the rule in
11   some way or the ability to reason with the rule and have
12   then statements and some flexibility.  But if it's just
13   a line of code that then does the next line of code and
14   says, well, I found that it's a threshold infrequent
15   shopper, therefore, make a better deal for them or worse
16   deal.  You know, some people like their frequent
17   customers and they'll give them a better deal, some
18   might want to entice the infrequent ones.  But if that's
19   built into the procedural logic, then I wouldn't -- I
20   can see how someone would describe it to their mother as
21   one of the rules in their system, but I wouldn't accept
22   it in the sense of the '525 Patent as a -- it wouldn't
23   be a flexibility mechanism that allows me to add or
24   change my business rule, so I would want to see that.
25   And since he didn't reference it, I'd have to search for

1   any event manager.  And so Dr. Cook identified the main

2   processor in the computer as an event manager.  A little

3   bit of a stretch if that's really what -- I'd have to go

4   back and read it carefully, but, you know, it's kind of

5   like saying, if I'm right and that's what he did, that

6   would be a little like saying, every program has data

7   and it all has events and it's all -- I mean, I'm

8   looking for the sort of technical attributes of a thing,

9   like an event manager.

10       Q.  But you are aware that the Court has construed

11  event manager to be hardware and/or software?

12       A.  Yes.  Right.  That is what the Court says.  And

13  so that is correct, event manager is hardware and

14  software.  Interestingly, as soon as we say that,

15  whenever the event manager appears, for instance, on

16  Claim 1, then we start saying things about it.  So,

17  while it's hardware and software, as long as it meets

18  these other things, like it's coupled, that is, it's a

19  separable system, talks to other systems or it has these

20  detecting, inferring and automatically initiating, then

21  these are -- so any -- nearly anything is an event

22  manager unless it does this, then it's the kind we care

23  about.  Okay.

24       Q.  Okay.  Let's move on to element C on 274.  You

25  state that Cragun does not perform this claim element.

1    middle.  Associate, tell me this.

2                   That there would be a possibility that you

3    could build expert systems that are recommending things.

4    In fact, we're going to see that in Cook, I think,

5    later.

6         Q.  Okay.  Let's see.  Element D on 277.

7         A.  Okay.

8         Q.  Just want to confirm that you state Cragun does

9    not perform this claim element.  And your basis is

10   because as we've discussed, there's -- the action is not

11   based on the inferred context, since we don't have the

12   inferring.

13        A.  I didn't say those words exactly, but that is,

14   again, consistent with what I've been looking for all

15   day long in these patents, which I think is in the '525,

16   isn't in these so far, and so I'm not saying it.

17        Q.  Okay.  All right.  Let's move on to Gorog.

18        A.  Yeah.  This should be Gorog arrest /KHEPB par

19   could or whatever it is.

20        Q.  Yeah.  Claim one's preamble is on 330.

21        A.  Give me a second on Gorog once I find it.  330?

22   I want to just remember.  I think I have a good memory

23   of this, but it's -- I'm still finding it.  Okay.  326.

24   Give me one second.  Oh, yeah, this is the OCT, Order

25   Computer Terminals.

1        Q.   Okay.

2        A.   Okay.  I have a high level memory of this.

3        Q.   Okay.

4        A.   So, preamble, computer implementing, sales

5    system uses facilities in its process.

6        Q.   Yes.  On 330, just wanted to confirm --

7        A.   I do confirm.

8        Q.   Okay.  Claim 1, element A.  Just want to

9    confirm that you state that Gorog does perform this

10   element.  That's at the bottom of 331.

11       A.   Yes.

12       Q.   Okay.  Element B, 333.

13       A.   A merciful great answer, yes.  Okay.  Where are

14   we now, page three --

15       Q.   On 333.

16       A.   333.  Okay.

17       Q.   Claim 1, element B.  Your opinion is that Gorog

18   does not perform this claim element.  Okay.  Down

19   towards the bottom of the page, last full paragraph, the

20   change of state, the OCT terminal seems to accept is

21   just the user entering the purchase.  This does not seem

22   to be equivalent to the '525 event manager that is

23   capable of integrating a collection of sales processes

24   and that uses inference and rules.

25       A.   So here I'm not -- truly not really objecting

1  to the possibility that Gorog could have mechanisms that

2  do the sort of historically common event management

3  because it is a distributed system, and my strong

4  preference would be to believe that distributed systems

5  almost always contain the simple event manager idea

6  because they're reacting to things from the outside.  So

7  I think I'm mainly saying that I didn't see in Gorog a

8  good enough description that would allow me to recognize

9  this claim element.

10      Q.  Okay.  Is that the basis for your use of the

11  term seems to?

12      A.  Yes.  I mean, this is --

13      Q.  So, in fact, it could possibly be --

14      A.  It could possibly be.  I just couldn't discern

15  it from the description that was in the Gorog.

16      Q.  Okay.  Element C on page 335.  You state that

17  Gorog does not perform this claim element.  This is the

18  full and firing stat.

19      A.  And I suppose to make life simple here I --

20  where in contrast I might have given an inch and so on,

21  I really want to see the evidence of, you know, show me

22  some bacon here, and I'm not seeing the bacon.  I didn't

23  see the bacon in the other one, and I could have

24  accepted that maybe there was something there because

25  events in the traditional variety have existed for a

1        Q.   Okay.

2        A.   So it wasn't required.

3        Q.   We are referring to the inferring step here.

4        A.   Right.   But I wasn't finding the inferring

5    mechanism even whether it was a single system, a single

6    function box or whatever.

7        Q.   Okay.

8        A.   Single module of the sales system.

9        Q.   Would you agree that Claim 1 does not require

10   sharing rules across system boundaries?

11       A.   Yes.   Well, let me see.   Claim 1 requires a

12   plurality of subsystems, and it requires a separable

13   event manager, and so to the extent that the event

14   manager is a -- it is a separable itself thing, that's

15   coupled, then, to those systems, then similar in this

16   picture, while the event manager module, it could talk

17   to just one system, but information interchange is

18   happening between the event manager and that at least

19   one system.   So the there will at least be two systems,

20   one of them being the event, which is -- it's a

21   separable thing that's coupled to a subsystem.

22       Q.   Okay.

23       A.   You see what I'm saying?

24       Q.   Yes, I do.   Thank you.   But does Claim 1

25   require that rules are shared or passed across subsystem

1   boundaries?

2        A.  No, I don't think so.

3        Q.  Okay.  Does Claim 1 require that the system be

4   a flexible scheme for sharing information?

5        A.  Claim one, whether it requires it or not, it's

6   used to facilitate a sales process that has this

7   plurality.  And so while I would say it doesn't

8   explicitly require it in the language of the claim, if

9   we go back into the body of the patent, even to the

10  title of the patent and also to the rationale for the

11  patent, we would be understanding that integration is

12  central and these are top level claims.  So my training

13  tells me that we are adding flexibility to the system at

14  the level of extracting out business rules that are then

15  easily changeable or shareable information, we're

16  putting those facts and rules in a place where we could

17  operate on them more easily.  And that would be a better

18  integration mechanism.  So, no, I'm reading that in

19  based on my understanding of -- my understanding, my

20  history, the patent specification motivation, and then

21  I'm looking at what these claims require.  And so, no,

22  I'm reading, to the extent that I'm reading it and

23  you're asking about it, Claim 1 doesn't explicitly talk

24  about why you do it.  It says, if you do these things,

25  then you're obeying Claim 1.

1      Q.   Would your answer be similar if I were to

2  mention the terms we've used today, modular and

3  expandable?  Like so that the system being modular or

4  the system being expandable, similarly, they're not

5  required in Claim 1?

6      A.   Right.  Claim 1 doesn't actually require them.

7  And actually modular and expandable can be -- can build

8  modular, expandable systems without having any inference

9  capability.  So, I suppose different ways to answer your

10 question, but I think the way you asked it, this claim

11 doesn't talk about modularity and expanse -- integration

12 or expansion joints or any of those notions explicitly,

13 but when I read it, knowing what I know and also knowing

14 the motivation, then I believe that it will result in a

15 system that does have those properties.

16     Q.   Okay.  Element D.

17     A.   Or it's intended to.  Element B?

18     Q.   D.  I'm sorry.  D.  On 336.

19     A.   Okay.

20     Q.   You state, Gorog does not perform this claim

21 element.  And, again, it appears your reliance here is

22 based on no inferred context.

23     A.   Right.

24     Q.   Okay.  Maybe due to the time, we'll skip Stone.

25 Let me just look at a couple more general questions.